Filed 5/7/13  In re D.J. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.J., a Person Coming Under the Juvenile Court Law. | D063160 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J517164B) |
| Plaintiff and Respondent, | |
| v. | |
| MARCUS J., | |
| Defendant and Appellant. | |

APPEAL from an order and judgment of the Superior Court of San Diego County,

David B. Oberholtzer, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel and Erica R. Cortez, Deputy County Counsel, for Respondent.

Biological father Marcus J.[1] appeals the judgment terminating his parental rights to his son, D.J. Marcus contends the juvenile court abused its discretion by denying his modification petition (Welf. & Inst. Code, § 388),[2] which sought reunification services or D.J.'s placement with Marcus with family maintenance services. Marcus also contends the court erred by declining to apply the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to termination of parental rights. We affirm.

## BACKGROUND

Marcus has a history of heavy substance abuse and criminal convictions dating from 1988 or earlier, when he was a juvenile. He was convicted of theft offenses; inflicting corporal injury on a cohabitant in 1990, 1991 and 1992; and possessing drugs in 1990, 1992 and 1999. After 1999, Marcus continued to commit crimes and use drugs. He experienced periods of sobriety while he was incarcerated. He supported himself by selling drugs.

Marcus has six children who are older than D.J. The oldest child lives with her mother and Marcus has no contact with that child. The remaining five older children were subject to seven or eight juvenile court dependencies. Some of the dependencies were based in part on Marcus's substance abuse and domestic violence. During the dependencies, he completed reunification services including substance abuse treatment, domestic violence treatment, parenting classes, therapy and anger management. Marcus

---

[1] Marcus never sought presumed father status.

[2] Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

initially reunified with two of the children, then they were removed from his care again. Between 2003 and 2011, Marcus failed to reunify with all five children and they were eventually adopted.

When D.J. was born in February 2012, Marcus was in jail on charges including selling narcotics. The San Diego County Health and Human Services Agency (the Agency) filed a dependency petition for D.J. a few days after he was born. The petition alleged D.J. and his mother, Rachelle L., tested positive for cocaine and marijuana.[3] Rachelle had a history of drug use and had failed to reunify with an older child. The petition alleged Marcus had a history of drug use, and he had failed to reunify with five of his children due to his drug use and domestic violence.

D.J. was detained in the hospital and then in the home of a nonrelative extended family member. After Marcus sent threatening letters to the caregiver's home, D.J. was moved in March 2012 to a confidential foster home. D.J. remained in that foster home for the remainder of this case.

In May 2012, the court made a true finding on the dependency petition. The court ordered an evaluation of the maternal grandmother's home in Nebraska pursuant to the Interstate Compact on the Placement of Children (ICPC) (Fam. Code, § 7900 et seq.). In June, the court declared D.J. a dependent and ordered him removed from parental custody

---

[3] Rachelle does not appeal. We mention her only as necessary.

and detained with a relative.[4]  The court denied Marcus reunification services (§ 361.5,

subd. (b)(10) & (11)) and set a section 366.26 hearing.

In October 2012, Marcus filed his section 388 petition.  In November, the court

denied the petition and terminated parental rights. By that time, the Agency had received

ICPC approval for the maternal grandmother's home and planned to move D.J. there

before Christmas.[5]

THE SECTION 388 PETITION

Section 388 allows the juvenile court to modify an order if a party establishes, by a

preponderance of the evidence, that changed circumstances exist and the proposed

modification would promote the child's best interests.[6]  (*In re Zachary G.* (1999) 77

Cal.App.4th 799, 806.)  When reunification services have been denied, the focus is on the

child's need for permanency and stability.  (See *In re Stephanie M.* (1994) 7 Cal.4th 295,

317.)  We review the denial of a section 388 petition for abuse of discretion.  (*In re

Jasmon O.* (1994) 8 Cal.4th 398, 415.)

Marcus's section 388 petition alleged it would be in D.J.'s best interests for Marcus

to receive reunification services, or for D.J. to be placed with Marcus with family

---

[4]    The court made this order at an unreported ex parte hearing.  The minute order is the only record of the hearing and does not contain a placement order.  There is no indication D.J. was moved to a relative's home.

[5]    The foster parent was unable to adopt for undisclosed reasons.

[6]    Here, the court found Marcus had demonstrated changed circumstances by going "through one of the toughest rehab programs that exists" and doing "quite well."  Thus, we address only the best interests aspect of section 388.

maintenance services, because D.J. knew Marcus, they had a relationship and D.J. had never met the maternal grandmother.

Marcus met D.J. in May 2012, when D.J. was approximately three months old. Their visits were supervised and lasted one and one-half hours. The visits took place once a week at first, then twice a week for the three months before the section 388 hearing. At the time of the hearing, D.J. was nine months old.

Marcus was appropriate and affectionate during visits and his bond with D.J. was growing. At the beginning of visits, it took D.J. some time to recognize Marcus and smile at him. D.J. also smiled at other people. D.J. often looked at and crawled toward the social worker during visits. At the close of visits, D.J. "display[ed] no emotion or distress when separating from" Marcus. D.J. smiled when he was returned to his caregiver.

Marcus resided in a sober living home where no children were allowed. He was unemployed. Selling illicit drugs had apparently been his only means of income for over 20 years. He had used drugs, on and off, during that period, and had been sober for fewer than 11 months. He had lost five children through dependency court and had a criminal history that included domestic violence convictions. Social worker Lerone Jenkins believed Marcus should not be given services in light of his criminal and child welfare histories; his 20-year history of unemployment; his history of relapsing and being re-incarcerated after participating in services; and D.J.'s youth and vulnerability. Jenkins explained that Marcus had a pattern of selling narcotics to provide for his children, then being incarcerated, removing him from his children's lives and leaving him unable to

5

provide for them.  The maternal grandmother had adopted D.J.'s half sibling, who was thriving in her care, and the maternal grandmother wished to adopt D.J.  D.J. needed stability, consistency and an attentive caregiver.

Marcus asserts we should apply the factors in *In re Aaliyah R.* (2006) 136 Cal.App.4th 437 in our section 388 analysis.  In that case, the reviewing court stated the juvenile court should consider the following factors in ruling on a section 388 petition: the seriousness of the problem that led to the dependency; the reason the problem continued; the strength of the parent-child and child-caregiver bonds; the length of time the child has been in the system; the nature of the change of circumstance; the ease by which the change could be achieved; and the reason the change was not made sooner. (*Id.* at pp. 446-447.)  A consideration of these factors would not assist Marcus.  His criminal and child welfare histories, substance abuse, drug selling and domestic violence were serious problems that existed for years, and continued despite the services that he was offered in previous cases.  Marcus was still unemployed and his period of sobriety was short in relation to the length of his substance abuse history.  D.J. had been in the dependency system for all of his life and had known Marcus for only about two-thirds of his life.  They had never lived together and were still in the process of forming a bond. Their visits had always been supervised.

The court did not abuse its discretion in denying the section 388 petition.

THE BENEFICIAL RELATIONSHIP EXCEPTION

Marcus does not contest the finding D.J. was adoptable. If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) One such exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) If terminating parental rights "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome . . . ." (*Ibid.*) The existence of a beneficial relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.) Examining the evidence in the light most favorable to the judgment (*ibid.*), we conclude substantial evidence supports the court's finding that the beneficial relationship exception did not apply.

Due to his incarceration, Marcus did not see D.J. the first three months of D.J.'s life. Although Marcus visited consistently after his release, he never progressed beyond supervised visitation. Nine-month-old D.J. had spent his entire life in foster care and out of Marcus's custody. Social worker Jenkins reported that Marcus interacted appropriately

7

and affectionately with D.J.  While D.J. appeared to enjoy the visits, he showed equal or greater enjoyment in interacting with others, and parted from Marcus easily.  Although D.J. had never met the maternal grandmother, he needed the stable, permanent home she offered.

## DISPOSITION

The order and judgment are affirmed.


MCCONNELL, P. J.

WE CONCUR:


MCINTYRE, J.


AARON, J.