Filed 9/30/15  In re K.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.B. et al., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>    Defendant and Appellant. | E063542<br><br>(Super.Ct.No. J248943 & J248944)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant J.B. (Father) is the father of K.J.B. (J.B.) and K.A.B (A.B.; collectively, "the children"). The juvenile court found the children were adoptable and terminated Father's parental rights. (Welf. & Inst. Code, § 366.26.)[1] Father raises two issues on appeal. First, Father contends the juvenile court erred by finding the children were adoptable. Second, Father asserts the juvenile court erred by not applying the parent-child bond exception to termination. (§ 366.26, subd. (c)(1)(B)(i).) We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.    BACKGROUND

The children are fraternal twins. They were born in December 2009. J.B. is male. A.B. is female. J.B. suffers from attention deficit hyperactivity disorder (ADHD) and cognitive delays. He has difficulty with short term memory, speech skills, and language skills. A.B. suffers from ADHD. She has difficulty with her short term memory and staying focused on tasks. She suffers speech and language delays.

The children's mother is T.M. (Mother). Mother is developmentally disabled; she has learning disabilities and mild mental retardation. In March 2013 Mother lived with her boyfriend (Joseph) at her aunt's home. Joseph is developmentally delayed.

Father had four older children who were born between 1991 and 2006. Father's parental rights to the older children were terminated in 2009. Father's older children

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

were adopted by Father's mother. Father worked as a forklift driver at a trucking facility. Father was the children's presumed father.

B.    DETENTION

On March 22, 2013, Joseph was seen hitting J.B.'s face. Mother did not protect J.B. A social worker from San Bernardino County Children and Family Services (the Department) contacted Mother. Mother admitted seeing Joseph "'be mean to the kids.'" Joseph's sister told the social worker she had seen Mother hit A.B.'s chest.

Mother's aunt (Aunt) and Aunt's daughter reported seeing Mother strike J.B., causing blood to pool in his nose. Aunt also expressed concern that A.B. had been vomiting intermittently for a month, and Mother had not taken the child to a doctor; rather, Mother yelled at the child when she vomited. Additionally, during the prior year, A.B. suffered a broken wrist and J.B. suffered broken ribs while in Mother's and Father's care. The Department detained the children.

The Department filed petitions alleging: (1) Father's whereabouts were unknown and that he left the children with no provisions for support (§ 300, subd. (g)); and (2) Father's parental rights to his four older children were terminated, thus placing the children at risk of harm (§ 300, subd. (j)). The juvenile court found the Department established a prima facie case, and ordered the children be detained outside of Mother's and Father's custody.

C.    JURISDICTION/DISPOSITION

Father was located. In the past, Mother and Father lived together in Bakersfield. Mother and Father engaged in acts of domestic violence with the children present and

3

Father threatened to kill Mother. Mother left the children in Father's care when she left Bakersfield with Joseph. Father was "kicked out" of his sister's home, so he left the children with a neighbor and called Mother "to come and get the children," although he was concerned about how Mother cared for the children.

Father informed the Department that he was currently unable to care for the children. Father explained, "'I am unable to take the twins; I don't have a place to live and I am living with a lady and my fiancé.'" Father said one of the women did not want the children in the home. Father denied being involved in domestic violence or having a history of domestic violence.

The juvenile court dismissed the allegation reflecting Father left the children with no provision for support. (§ 300, subd. (g).) The court found true the allegation that Father's parental rights to his older children were terminated. (§ 300, subd. (j).) The court granted Father supervised visitation with the children once per week for two hours. The court ordered Father to participate in family reunification services.

D.    SIX-MONTH REVIEW

The children were placed in the same foster home, along with their half sibling, V.F., who was Mother and Joseph's child. The children were "well-bonded to their foster family."

Father did not participate in any of his court ordered reunification services. Father visited the children once during the period of July 15, 2013, to October 15, 2013. The juvenile court modified Father's supervised visitation with the children to once per month for one hour.

4

E.      12-MONTH STATUS REVIEW

Mother moved into a home with Father and Father's fiancée in Victorville. Father needed Mother's Social Security income to help pay the rent. Father questioned why he needed to participate in services because he was a non-offending parent. Nevertheless, Father attended two domestic violence classes, but missed four domestic violence classes. Father attended three parenting classes and missed three parenting classes. Father failed to participate in individual counseling. Father had difficulty visiting the children because he worked Monday through Saturday in Ontario. In March and April 2014, Father generally visited the children with Mother once per week for two hours. The visits were "appropriate." Father did not visit the children during May 2014.

The juvenile court found Father made minimal progress in his case plan. The court granted Father supervised visitation with the children once per week for two hours. The court ordered Father to participate in reunification services.

F.      18-MONTH STATUS REVIEW

Father was directed to participate in 52 weeks of domestic violence classes. Father attended eight of the classes. Father was directed to participate in 12 weeks of parenting classes. Father attended 10 of the classes. Father had not participated in individual counseling due to his work schedule. Father's visits took place at a park on Sundays, separate from Mother's visits. Father missed visits "at times." On September 9, 2014, Father and his fiancée were 15 minutes late to the visit. Father brought his adult son and the son's girlfriend to the visit without obtaining prior authorization.

Father's fiancée cursed while the children were present. Father and his fiancée discussed the case with the children's caretaker. J.B. kicked woodchips at Father, causing scratches on J.B.'s foot. The Department moved Father's visits back to the Department's offices.

On September 4, the children and their half sibling, V.F., were moved to the home of a nonrelated extended family member. The children adjusted well to their placement and appeared to be "well-bonded to their new family."

Father testified at the status hearing. Father explained that his parental rights to three of his older children were terminated because he was a long-haul truck driver and was not home. Father explained that the older children's mother was abusive.

The juvenile court found Father failed to make substantive progress in his case plan and made minimal progress in resolving the issues that led to the dependency. The court terminated Father's reunification services. The court granted Father supervised visitation with the children for one hour two times per month.

G.     TERMINATION

The children were approved for wraparound services, and they continued to reside with the nonrelated extended family member. A.B. attended the Head Start Preschool program. She knew her shapes, colors, alphabet, and numbers one through 20. At times, A.B. had crying fits for several hours and was aggressive. J.B. was on a waiting list for preschool. J.B. also knew his shapes, colors, alphabet, and numbers one through 20.

6

From September 4, 2014, through March 12, 2015, Father visited the children four times. Before the visits, the children often had physical fights with one another, would be defiant with their prospective adoptive parents, and ask many questions regarding whether Father would be present at the visit. If Father failed to visit with the children, the children blamed their prospective adoptive mother for not waiting long enough for Father to arrive.

The children's birthday was in December. Father visited the children on their fifth birthday, but failed to say "Happy Birthday" or bring a present. The children cried after the visit and asked why Father did not wish them a happy birthday or give them a present. At a visit two weeks later, Father wished the children a happy birthday and gave them a Lego set for children 10 years old or older. The Lego pieces were too small for the children, so the Legos had to be put away.

After the visits, the children argued with one another about who got more attention from Father, which would result in hitting and yelling that would last for days afterward. On the night A.B. arrived home from the visits, she would have "'meltdowns'" in which she screamed for hours, and hit and kicked her prospective adoptive mother. On one occasion, the prospective adoptive mother had to go to the hospital because A.B. kicked her jaw. The children were making progress with their wraparound services, but the progress that was made between visits was lost once the children saw Mother and/or Father.

The prospective adoptive parents wanted to adopt the children and their half sibling, V.F. The children were too young to express their wishes about adoption. The

children appeared comfortable in their prospective adoptive parents' home and appeared to be attached to them. The children referred to Mother and Father as "'mom' and 'dad,'" and referred to the prospective adoptive parents by their first names. The prospective adoptive mother stayed home during the day to care for the children. The Department concluded the children were adoptable because the prospective adoptive parents were committed to the children's long-term care, the prospective adoptive parents loved the children, the children were young, and the children were attached to the prospective adoptive parents.

On April 23, 2015, Father filed a request to change a court order. (§ 388.) Father asserted circumstances had changed because (1) he completed individual counseling, parenting classes, and domestic violence classes; and (2) he was no longer living with Mother. Father requested the children be returned to Father's custody, or that Father be given more services and visitation. Father asserted the change would be in the children's best interests because the children wanted to live with Father, the children called Father "dad" or "daddy," the children would suffer if they lost their relationship with Father, the children were happy during visits with Father, and the children were unhappy in foster care. A letter attached to the request reflected Father completed a 12-week parenting class and a 12-week domestic violence program.

In regard to Father's request for increased visitation, the Department noted that between November 26, 2014, and April 13, 2015, Father missed six visits and attended four visits. As to Father finishing classes and counseling, a letter from a counselor about Father's progress reflected Father had been able to incorporate some new skills

8

into his daily living, but Father gained "minimal insight" into how his behavior affected others; and Father lacked "essential parent protective" skills, which was a "serious issue." In regard to the children wanting to live with Father, a Department social worker noted that she had visited the children several times at the prospective adoptive parents' home. The children appeared "very happy" at the home. The children hugged the prospective adoptive parents and told the prospective adoptive parents that they loved them. During one visit at the home, A.B. told the social worker, "'I want to stay here. I just want to visit with my dad. Old dad talked to our dad and we want to stay here.'"

Father testified at the hearing. Father explained that the majority of visits he missed were due to conflicts with his work schedule. Father explained that the children lived with him from the time of their birth until he "returned them to their mother," prior to the children being removed. Father asserted that he and the children shared a strong bond. During visits, Father and the children interacted by playing with toys. Father admitted that from September to March he only visited the children four times.

The juvenile court found the petition failed to state a change in circumstances, and it was not in the children's best interests to grant the request. (§ 388.) The court denied Father's request. The court found the children were likely to be adopted. The court said, "They are adoptable generally because of their young age, because of their physical health. They do have some needs, some special needs, that the concurrent adoptive parents are well aware of, but the Court finds that even generally, even with those needs, they would be adoptable, but specifically they are adoptable because they

are all together with their siblings, which is a very good thing." The court concluded the children were "both generally and specifically adoptable."

In regard to the parent-child bond exception, the trial court found the exception did not apply because Father did not have regular visits with the children. The court "noted the number of visits missed." The juvenile court also found Father did "not occupy a parental role" in the children's lives. The court concluded Father was a friendly visitor to the children. The court terminated Father's parental rights.

## DISCUSSION

### A. ADOPTABILITY

Father contends the juvenile court erred by finding the children are generally and specifically adoptable. The Department contends Father forfeited this issue for appeal by failing to challenge the evidence in the juvenile court. We choose to address the merits of Father's contention.

"A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.' [Citation.] The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child.

"If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. [Citation.] When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, [i.e., specifically adoptable], the trial court must determine whether there is a legal impediment to

10

adoption. [Citation.] The juvenile court should also explore a child's feelings toward his or her parents, foster parents and prospective adoptive family.

"On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time. [Citations.] . . . We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the trial court." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231-1232.)

The juvenile court found the children were "adoptable generally," so we will discuss general adoptability. The evidence reflects the children were five years old. A.B. attended preschool, and J.B. was on a waiting list for preschool. Both children knew shapes, colors, the alphabet, and numbers one through 20. The children's emotional issues were improving due to wraparound services. The emotional progress subsided when the children visited Mother and Father or had failed visits with Mother and Father. The children were not taking medication for their ADHD.

Given the children's young age, their physical health, their ability to learn, their progress with emotional issues when away from Mother and Father, and their ADHD not requiring medication, it was reasonable for the juvenile court to find the children generally adoptable. It appears the children have some special emotional needs, but the special needs are manageable with services. Accordingly, we conclude the foregoing evidence provides substantial support for the finding that the children are adoptable because the children are young and generally healthy.

Father contends the children were not adoptable because they might be autistic, they have speech and language delays, and they are defiant toward their prospective adoptive parents. Father's argument is highlighting the evidence that does not support the judgment. Father is correct that the record includes evidence that does not favor a finding of adoptability. However, as set forth *ante*, there is substantial evidence supporting a finding that the children are adoptable. Our review is limited to determining that the record includes substantial evidence supporting the juvenile court's finding. (*In re Walter E.* (1992) 13 Cal.App.4th 125, 140.) Because the record includes substantial evidence supporting the adoptability finding, we find Father's argument to be unpersuasive.

The juvenile court also found the children to be specifically adoptable. Father asserts there is a lack of substantial evidence to support the finding of specific adoptability. Because we have concluded there is substantial evidence supporting the finding of general adoptability, the issue related to specific adoptability has been rendered moot. (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364 [when no effective relief can be granted, an issue is moot].) Accordingly, we do not address the substance of the specific adoptability issue.

B.     PARENT-CHILD BOND EXCEPTION

Father contends the juvenile court erred by not applying the parent-child bond exception to terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).)

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable.

(§ 366.26, subd. (c)(1).)  One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

There is a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception—(1) substantial evidence; (2) abuse of discretion; or (3) a hybrid of substantial evidence and abuse of discretion.  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [First Dist., Div. Three applying the abuse of discretion standard]; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 [Second Dist., Div. Eight applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [Second Dist., Div. Seven applying the hybrid standard]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [Sixth Dist. applying the hybrid standard].)  Father applies the substantial evidence standard of review.  Thus, we too will apply the substantial evidence standard of review.

In regard to regular visitation and contact, the record supports the juvenile court's finding because (1) Father visited the children four times during the six month period from September 2014 to March 2015; (2) Father missed two of three visits in April 2015; and (3) parental rights were terminated on May 11, 2015.  The evidence reflecting four visits in a six-month period combined with two missed visits in the

13

month prior to termination is substantial support for the juvenile court's finding that Father did not maintain regular visitation with the children because the visits were too infrequent to constitute regular contact. Accordingly, substantial evidence supports the juvenile court's finding that the first prong of the parent-child bond exception was not satisfied.

Next, we address the benefit prong. "The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'" (*In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.)

"'The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' [Citation] '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937-938.)

At the time of termination, in May 2015, the children were five years old. At the time of detention, in April 2013, the children were three years old. The children lived with Father from the time they were born until sometime prior to detention, when he left the children with a neighbor and then called Mother to retrieve the children. We infer

14

the children lived with Father for approximately the first three years of their lives. Thus, a little over half of the children's young lives were spent in Father's custody.

As to the effect of Father's interaction with the children, the evidence reflects the children's emotional progress, which they gained from wraparound services, was lost upon visiting Father or upon Father missing visits. When Father missed visits, the children cried. When A.B. returned home from visits she would have "'meltdowns'" wherein she would scream for hours and hit and kick her prospective adoptive mother. The children would act out and fight with one another in conjunction with the visits. The crying, fighting, and screaming are substantial evidence supporting a finding that Father's interaction with the children had a negative effect.

In regard to the children's particular needs, the children both suffered from ADHD, but were unmedicated. A.B. had emotional meltdowns after visiting Father. The children participate in wraparound services, and they have benefitted from the services. The children need an adult who has the ability to help them participate in services, e.g., someone to transport them, be on time to appointments, and work with them at home.

In sum, the evidence reflects the children were three years old when they were detained, five years old at the time of termination, they spent a little over half of their young lives in Father's care, Father's interactions with the children had negative effects, and the children needed a responsible adult who was available to assist them with wraparound services. Given this evidence, Father did not fulfill the role of a parent in the children's lives. Father rarely visited the children, i.e., four times in six months.

During visits, he and the children played with toys—Father did not assist the children with progressing through their wraparound services. Accordingly, there is substantial evidence reflecting the relationship with Father does not promote the children's well-being too such a degree as to outweigh the well-being the children would gain in a permanent home with new, adoptive parents.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER\
J.

We concur:

McKINSTER\
Acting P. J.

KING\
J.

16