38 Cal.Rptr.3d 876 (2006)
136 Cal.App.4th 437
In re AALIYAH R., a Person Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Respondent,
v.
Tryphena R., Defendant and Appellant.
No. B183517.
Court of Appeal, Second District, Division Eight.
February 3, 2006.
*877 Andre F.F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant.
Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Deborah L. Hale, Deputy County Counsel, for Plaintiff and Respondent.
FLIER, J.
Tryphena R., mother of four-year-old Aaliyah, appeals from two juvenile court orders: an order denying a petition for modification under Welfare and Institutions Code section 388[1] and an order terminating parental rights. Mother asserts the court abused its discretion in denying her section 388 petition by disregarding significant factors that compelled either the child's return to mother's custody or further family reunification services. Mother further asserts the court erred in terminating parental rights because the parental relationship exception under section 366.26, subdivision (c)(1)(A) applies.[2] We affirm.

FACTS
Mother was 15 years old and a dependent child of the court when she gave birth to Aaliyah in January 2002. After her birth, Aaliyah resided with mother at St. Anne's Group Home (St. Anne's), a residential placement with specialized services for teens who are pregnant or have children.
The record indicates a long period of unstable behavior by mother, not the least of which was her neglect and refusal to take care of Aaliyah, despite the juvenile court's extensive efforts to avert loss of mother's parental rights.
In August 2002, when Aaliyah was seven months old, the Los Angeles County Department of Child and Family Services (Department) filed a petition under section 300, subdivision (b) on Aaliyah's behalf. *878 The petition as amended alleged that mother was a minor herself and had only a limited ability to care for her child and that she had left Aaliyah unattended without adult supervision and in a poor state of hygiene.[3] The court ordered Aaliyah to be detained in foster care with monitored visits for mother.
The Department provided documentary evidence, supported by mother's admissions, that she was frustrated with caring for her baby, screamed at and neglected the baby, had limited ability to care for the baby, was chronically noncompliant with placement rules and regulations and needed work with anger management in relation to her peers.
In October 2002, the juvenile court found the amended petition to be true and declared Aaliyah a dependent of the juvenile court. The court ordered six months of reunification services for mother and ordered her to attend individual counseling to address case issues including anger management. The court allowed weekly monitored visits between mother and Aaliyah and gave the Department discretion to liberalize and increase the visits.
At mother's request, Aaliyah was placed in the home of Mildred J. (Mildred), who was an extended family member and then caretaker of mother's sister. At this time, St. Anne's was providing mother with a number of services, including parenting education, individual and group counseling, 24-hour medical care, 24-hour staff support, sex education and family planning, individual educational counseling, an onsite school, food, a clothing allowance, passes for visits with Aaliyah as well as with mother's family and transportation assistance.
In March 2003, the Department reported to the court that Mildred had asked the Department to remove Aaliyah and her aunt from Mildred's home after mother made unfounded allegations that Mildred was neglecting Aaliyah. The Department reported that mother was showing overall improvement, but she was not complying with the rules and regulations at her placement. She continued to have issues with anger management, of going AWOL (absent without leave) and inappropriate interaction with her peers. During this period, mother had monitored visits with Aaliyah and had begun attending to Aaliyah's needs during the visits.
In June 2003, mother's case manager at St. Anne's testified that although mother's behavior had recently improved, her behavior was inconsistent and she had been "struggling." Nonetheless, the court found that mother had made substantial progress towards alleviating and mitigating the causes that had required Aaliyah's placement. Over the Department's objections, the juvenile court ordered Aaliyah to be placed with mother and ordered the Department to provide mother with further family maintenance services.
The court imposed several conditions in placing Aaliyah with mother: mother was to remain at St. Anne's, continue in its structured program of parenting, participate in "mommy and me" classes and continue to attend Alateen meetings. The court determined the permanent plan would be Aliyah's return to the home of her mother with termination of jurisdiction as the goal.
Mother, however, did not do well after Aaliyah returned to her care. Approximately four months later, in October 2003, the Department filed a supplemental juvenile dependency petition alleging mother *879 was unable to continue caring for Aaliyah. Mother had again neglected Aaliyah and then reportedly had gone AWOL with her, only to call a relative the following day to request that she come and get the child. Mother told the social worker she wanted Aaliyah back in foster care and no longer wanted to care for the child. The juvenile court ordered Aaliyah to be detained in shelter care and ordered the Department to provide mother with monitored visits and family reunification services.
In early December 2003, the Department reported that mother had gone AWOL from St. Anne's in November 2003 and was still AWOL as of the date of the report. The report detailed numerous instances of mother's neglecting Aaliyah. Mother had told other residents she wanted her freedom, was frustrated with Aaliyah and was going to have Aaliyah taken away. Mother told staff members she wanted to "give Aaliyah back." She told another resident that she "loved her new boyfriend so much that she couldn't keep Aaliyah and be with him." The court modified its June 2003 order and directed that Aaliyah remain a dependent and suitably placed in shelter care.
In January 2004, the court sustained an amended supplemental petition stating that mother was unable to continue to provide ongoing care for her child. The court found the previous court disposition had not been effective in Aaliyah's "rehabilitation or protection." The court allowed mother a minimum of twice weekly two-hour monitored visits with her child.
In March 2004, the juvenile court determined mother had only inconsistently complied with the case plan and terminated mother's reunification services because the time for such services had run. However, over the Department's objection, the court ordered the Department to provide mother with "family reunification like" services. The court terminated its June 2003 "home of parent-mother" order and directed that Aaliyah be suitably placed. The court allowed mother visits of "no less than twice a week or as frequent[ly] as possible in a neutral setting."
From March 2004 to May 2004, mother regularly visited Aaliyah without incident. She behaved appropriately with the child and was attentive, alert and nurturing. However, the Department reported to the court that mother's current caregiver had reported behavioral problems with mother leading to the possibility mother would need a new placement.
The court convened a number of permanency planning hearings under section 366.26. For a permanency planning hearing in July 2004, the Department reported that Aaliyah, then two years old, was a happy, smiling, talkative, highly intelligent and easily engaged child. The foster mother had considered adopting Aaliyah, but she decided against doing so because of the possibility of having future contact with mother. Mother initially had visited her child consistently but for the last two months had frequently failed to show up for visits or to call and cancel. The Department reported that the inconsistency in mother's visitation had traumatized Aaliyah emotionally and psychologically because she was old enough to associate the visitation site with an expectation of seeing her mother. Mother again had told the social worker that she did not want to take care of Aaliyah and wished to have her adopted. Mother had also called the former foster mother, Mildred, and asked her to adopt Aaliyah. The Department informed the court that Mildred was now willing to provide a permanent home for Aaliyah under a permanent plan of adoption and to allow mother to visit the child after adoption so long as mother behaved appropriately.
*880 In September 2004, the juvenile court had a second permanency planning hearing. For the hearing, the Department further reported that mother was temporarily in a group home but would not be allowed to stay past her impending 18th birthday due to her inappropriate behavior, lack of motivation and chronically going AWOL. Since the court's visitation order in March 2004, mother had vacillated between "consistency and total non-compliance." Mother had made only a fraction of the minimum number of allowed visits to Aaliyah and frequently had failed to show up or call. Pursuant to court order, the Department had made arrangements for mother and Aaliyah to participate in a parent and child interactive program. The provider had reported that mother had attended only three of eight scheduled visits. The court admonished mother about her lack of compliance, stating: "You are doing practically nothing. You are sitting at home watching TV. Are you seriously trying to get your child back? You better get more serious about it[,] young lady. You go out and get a job and you go to school on a regular basis." The court authorized the Department to gradually transition Aaliyah back into Mildred's home.
In October 2004, the court held a third permanency planning hearing. Mother again was AWOL and did not appear. The Department reported that mother was now 18 years of age and residing in the unauthorized home of her maternal grandmother, in whose custody mother had conceived Aaliyah. Mother was three months pregnant with a second child, and the expected baby's father (Davione M.) was incarcerated for possession of a firearm. The Department informed the court that Mildred was now a licensed foster caretaker and still willing to adopt Aaliyah. The court ordered Aaliyah to be placed in Mildred's home and ordered the Department to complete a home study for Mildred. The matter was continued to January 2005 for another permanency planning hearing.
In January 2005, the court held a fourth permanency planning hearing and set a contested permanency planning hearing for March 2005 to determine whether adoption, long term foster care or guardianship should be the appropriate plan.
In March 2005, mother filed a section 388 petition seeking modification of the court's March 2004 order terminating her family reunification services and setting a hearing on selection and implementation of a permanent plan. Mother asked the juvenile court to either return Aaliyah to mother's custody or grant mother further reunification services. In the event the court denied such relief, mother requested that the court order a bonding study to aid in her contest of the permanency plan.
Mother alleged changed circumstances, stating that she had returned to St. Anne's in late December 2004 and had since been complying with its rules and programs. She also alleged that she was addressing her parenting and case issues through individual therapy and had visited Aaliyah during the last month. She indicated that she was successfully attending school and working toward a high school diploma. She further had taken or completed independent living skills classes, and St. Anne's was willing to facilitate appropriate living arrangements for Aaliyah.
The court set mother's petition for modification for a hearing to be held in April 2005.
In March 2005, for the fifth section 366.26 hearing, the Department informed the court that Aaliyah was doing very well in Mildred's home. She was developing on target and appeared mentally and emotionally stable. A further report indicated a home study had been completed on Mildred, and the child appeared to be well *881 bonded with her. In an interim review report, the Department also noted that Aaliyah appeared to be thriving in Mildred's care and was now calling Mildred "mom." Mildred was providing the child with a nurturing, stable environment. The child appeared to be well dressed, well groomed, happy and healthy. The Department reported that since Aaliyah's placement with Mildred in December 2004, mother had visited the child four times, in February and March 2005. Before that, when Aaliyah was in her prior foster home, mother had not visited from September 2004 to December 2004. The Department recommended that the court deny mother's section 388 petition and terminate parental rights. The court further continued the permanent planning hearing to April 2005.
The juvenile court heard mother's section 388 petition on April 7 and 8, 2005. Mother did not testify at the hearing regarding her changed circumstances as the court found there was no good cause to merit hearing her direct testimony.[4] In lieu of her testimony, mother submitted her written declaration as documentary evidence. In her declaration, mother stated that she had "become a responsible, respectable woman" who wanted the opportunity to care for and "be a role model for my daughter." She stated she had made significant changes in her life and was now ready to take care of her daughter.
On April 8, 2005, after considering mother's declaration, the juvenile court denied mother's petition, indicating her declaration only served to show "how much time she has wasted in her life." The court also denied mother's request for reunification services and further request to either place Aaliyah with mother or change the child's placement. However, over the Department's objections, the court continued the permanency planning hearing and ordered a bonding study to be performed for the specific purpose of determining whether termination of parental rights would be detrimental to the child.
The appointed psychologist, Dr. Daniel Kramon, submitted a bonding study pursuant to the juvenile court's order. Dr. Kramon personally interviewed mother and observed Aaliyah and mother interacting at his office. He noted Aaliyah had spent a substantial amount of time in three homes over the course of her young life. She spent approximately the first seven months of her life with mother, six months with Mildred, 14 months with foster mother Ms. S., five months with mother again, one month with Ms. S. after that and, finally, the last five months with Mildred. In Dr. Kramon's opinion, it was reasonable to conclude that during each of these placements, some type of bond was formed with each primary caretaker. He observed that mother related to Aaliyah in a "loving, natural, engaging and thoroughly appropriate manner," but it was likely Aaliyah had also formed a "close bond" with Mildred and Mildred's two granddaughters that resided in her home. He opined it was likely that Aaliyah's closest bond existed with "the caretaker with whom she has resided for the last several months."
Dr. Kramon concluded that, although there apparently was an "affectionate closeness" between Aaliyah and her mother, "the basic link of trust that is imperative for a close bond does not exist to the extent that it likely exists between Aaliyah and Mildred." He admitted this conclusion had an "assumptive aspect" because he had not been able to observe the child *882 and Mildred together.[5] Dr. Kramon thought Aaliyah was progressing well and was likely thriving in Mildred's home. He stated that "to remove her from this home, especially at a stage in her development where she has acquired a high degree of communication and relating skills, could be emotionally deleterious for her." He believed if parental rights were terminated, there might be some "disappointment" on Aaliyah's part because she reportedly looked forward to contacts with mother, but it would not be substantially detrimental to Aaliyah as she had only limited contact with mother since October 2003. On the other hand, if Aaliyah were to be removed from Mildred's home, where she felt safe and secure, there likely would be a "significant risk" of emotional or psychological distress as well as a further disruption to the bonding process that could result in serious emotional harm. Dr. Kramon concluded the benefits of Aaliyah's remaining in a secure and loving home outweighed the consequences of terminating parental rights.
On May 26, 2005, the juvenile court held the sixth and final hearing on the selection of a permanent plan. Mother's new baby boy was one and one-half months old at this time and placed with her at St. Anne's. Mother testified she had moved into St. Anne's in December 2004 and had resumed visiting Aaliyah in February 2005. Mother admittedly did not visit Aaliyah from September 2004 to February 2005, stating she was "going through a lot of problems." She stated she had been "immature" and "wasn't thinking about anyone at the time but myself." She had asked Mildred to adopt Aaliyah because she thought she "didn't have a chance of getting [Aaliyah] back." Mother believed she had matured since then and opposed the permanent plan of adoption because she did not want Aaliyah to feel abandoned as she herself had felt and did not wish Aaliyah to believe mother had chosen the new baby over Aaliyah.
Based on the entire case file, the court found by clear and convincing evidence that Aaliyah was adoptable and it was likely the child will be adopted. The court accordingly ordered parental rights terminated. The court further determined that mother had not proved the parental relationship exception under section 366.26, subdivision (c)(1)(A) because the court found that mother's "inconsistent pattern of visitation" did not satisfy the visitation requirement and that the termination of parental rights would result in no detriment to the child.
Mother filed a timely notice of appeal from the orders denying her section 388 petition and terminating parental rights.

DISCUSSION

1. The Juvenile Court Did Not Abuse Its Discretion by Denying Mother's Section 388 Petition
Mother contends the juvenile court abused its discretion in denying her section 388 petition because she met the established factors mandating the court to either return Aaliyah to her custody or to grant mother additional reunification services. We disagree.
Section 388 states in pertinent part that a parent may "upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of *883 court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a).) The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstance or new evidence and that the modification would promote the best interests of the child. (In re Michael B. (1992) 8 Cal.App.4th 1698, 1703, 11 Cal.Rptr.2d 290.) This is determined by the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system; and the nature of the change in circumstance, the ease by which the change could be achieved, and the reason the change was not made sooner. (In re Amber M. (2002) 103 Cal.App.4th 681, 685, 127 Cal.Rptr.2d 19; In re Kimberly F. (1997) 56 Cal.App.4th 519, 530-531, 65 Cal.Rptr.2d 495.) Whether an order should be modified rests within the sound discretion of the juvenile court, and its decision will not be disturbed on appeal absent a clear abuse of discretion. (In re Jasmon O. (1994) 8 Cal.4th 398, 415, 33 Cal.Rptr.2d 85, 878 P.2d 1297; In re Stephanie M. (1994) 7 Cal.4th 295, 318, 27 Cal.Rptr.2d 595, 867 P.2d 706 (Stephanie M.).)
The record in this case indicates that the reason for the dependency was very serious and, even though mother indicated an awareness of the nature of the problems and took responsibility for them, she had made little actual progress in addressing the causes of Aaliyah's dependency. Although mother and child appeared to have developed a bond during their periods together, by this time Aaliyah had been in foster care for longer than her times with mother, and the indications were that she had well bonded with her prospective adoptive mother.
Mother argues that, in the short period between December 2004 and April 2005, she showed a "legitimate," "genuine" and "lasting" change of circumstances. Mother attributes the dependency action solely to her immaturity and young age, which she claims "essentially ended in December 2004, after mother grew up." The juvenile court clearly did not find that mother had shown a genuine change of circumstances. After hearing testimony from a St. Anne's counselor regarding mother's most current efforts, the court concluded "there has been no indication that the indicated denial of the [section] 388 [petition] should change." After reviewing mother's three-and-a-half pages-long, single-spaced declaration in support of her claimed changed circumstances, the court further concluded mother's recitation only established "how much time she has wasted in her life."
The record is replete with evidence supporting the court's determination. Indeed, mother acknowledges she did not have a "perfect" record and had displayed unstable behavior throughout this case. Such behavior admittedly included a refusal to take care of Aaliyah, going AWOL numerous times from St. Anne's and other placements, refusal to comply with the rules of her placements, refusal to attend school counseling, refusal to take her prescribed medication, and inability to get along with peers and staff at her different placements, among other more serious inappropriate behavior. That mother may have had a last-minute change of heart during the last brief months of a long saga of poor choices, inappropriate behavior and refusals to care for her daughter is not compelling evidence of a "legitimate," "genuine" or "lasting" change of circumstances.
Nevertheless, mother argues she maintained a strong bond with Aaliyah, compelling the juvenile court to grant her section *884 388 petition.[6] The record establishes, however, that the child had also bonded well with her prior foster mother and with her present caretaker and prospective adoptive parent, Mildred. Moreover, when mother filed her petition for modification the child had already lived in foster care far longer than the two short periods she had lived with mother.
Mother contends her problem was one of "immaturity" that was "easily" ameliorated or fully eliminated with her "coming of age." She argues she had been stable after returning to St. Anne's in December 2004, as demonstrated by 14 positive behavior reports from late December 2004, to early March 2005.[7] However, the court could reasonably infer from such reports that mother had yet to demonstrate she could consistently handle the responsibilities of caring for herself and two children. Mother's problems, especially her poor behavior choices, were recurrent throughout the entire case, and there was little evidence to indicate the recent improvements were genuine, permanent or would lead to mother's taking on responsibilities as a parent. Mother's declaration indicated she understood what behavior was required of her as a parent, but, as the court observed, "whether or not she does those things is quite another issue. . . ."
After reunification services have been terminated, the parents' interest in the care, custody and companionship of the child are no longer of overriding concern. (Stephanie M., supra, 7 Cal.4th at p. 317, 27 Cal.Rptr.2d 595, 867 P.2d 706.) The focus then shifts to the child's need for permanency and stability, and there is a rebuttable presumption that continued foster care is in the child's best interests. (Ibid.; In re Marilyn H. (1993) 5 Cal.4th 295, 309, 19 Cal.Rptr.2d 544, 851 P.2d 826.) The juvenile court quite properly looked to Aaliyah's need for permanency and stability in denying mother's petition for modification of its prior orders. When, as here, the permanent plan is adoption, that presumption is even more difficult to overcome. (In re Angel B. (2002) 97 Cal.App.4th 454, 464, 118 Cal.Rptr.2d 482.)
We find no abuse of discretion.

2. The Juvenile Court Did Not Abuse Its Discretion in Finding the Parental Relationship Exception to Termination of Parental Rights Did Not Apply
Mother contends the juvenile court erred in terminating parental rights because she met her burden of proving the parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(A) applied and because insufficient evidence supported the court's finding otherwise.
As mother recognizes, the party claiming an exception to adoption has the burden of proof of establishing by a preponderance of evidence that the exception applies. (In re Melvin A. (2000) 82 Cal.App.4th 1243, 1252, 98 Cal.Rptr.2d 844; see Cal. Rules of Court, rule 1463(e)(3).) We review the juvenile court's decision *885 whether to apply the parental relationship exception to termination of parental rights for abuse of discretion. (In re Jasmine D. (2000) 78 Cal.App.4th 1339, 1348-1349, 93 Cal.Rptr.2d 644 (Jasmine D.).)
Under section 366.26, subdivision (c)(1), if the juvenile court finds by clear and convincing evidence that a child is adoptable, it will terminate parental rights unless it finds termination would be detrimental because of one of five listed exceptions. Under section 366.26, subdivision (c)(1)(A), the court may forego adoption and refrain from terminating parental rights only if a parent has maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination. (In re Beatrice M. (1994) 29 Cal.App.4th 1411, 1418, 35 Cal.Rptr.2d 162 (Beatrice M.) [loss of mere "frequent and loving" contact with parent insufficient to show detriment].) The benefit to the child from continuing such a relationship must also be such that the relationship "`promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (Ibid., quoting In re Autumn H. (1994) 27 Cal.App.4th 567, 576, 32 Cal.Rptr.2d 535 (Autumn H.).) A child who is determined to be a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may benefit the child to some degree but does not meet the child's need for a parent. (Jasmine D., supra, 78 Cal.App.4th at p. 1350, 93 Cal.Rptr.2d 644.) Adoption, when possible, is the permanent plan preferred by the Legislature if it is likely the child will be adopted. (Autumn H., at p. 573, 32 Cal.Rptr.2d 535.)
Here, the juvenile court specifically found mother's "inconsistent pattern of visitation" failed to satisfy the first prong of the exception. Mother concedes her visits with Aaliyah were not regular until February 2005. By mother's own admission, therefore, mother cannot and did not establish that she had maintained regular visitation with her child. (Autumn H., supra, 27 Cal.App.4th at p. 575, 32 Cal.Rptr.2d 535.)
Mother also failed to satisfy the second prong of the analysis since she did not show her bond with Aaliyah was sufficiently strong that the child would suffer detriment from its termination. The court's balancing of competing considerations must be performed on a case-by-case basis, taking into account variables such as the child's age, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between the parent and child and the child's individualized needs. (Jasmine D., supra, 78 Cal.App.4th at pp. 1349-1350, 93 Cal.Rptr.2d 644; Autumn H., supra, 27 Cal.App.4th at pp. 575-576, 32 Cal.Rptr.2d 535.) When the court made its termination order in May 2005, Aaliyah was only three years old. She had spent more time living in foster care than with mother and had not lived with mother since October 2003. Although Dr. Kramon's bonding study indicated an "affectionate closeness" between the child and mother, Aaliyah had also closely bonded with Mildred, whom she called "mother." Mildred provided her with a "safe, secure and trusting" environment. Dr. Kramon had concluded that even though Aaliyah would be "disappointed" in not being with mother, she would not suffer substantial detriment from the termination of parental rights. More importantly, Dr. Kramon opined there could *886 be a significant risk Aaliyah would suffer emotional or psychological distress, as well as further disruption to the bonding process, were the child to be removed from Mildred's home.
There was, on the other hand, no evidence that severing the relationship with mother would harm Aaliyah to any extent, much less cause grievous detriment. Mother's "affectionate closeness" with Aaliyah does not equate to the type of "benefit from a continuing relationship" contemplated by the statute. (Beatrice M., supra, 29 Cal.App.4th at pp. 1418-1419, 35 Cal.Rptr.2d 162.) Mother had not occupied a parental role in relation to Aaliyah for quite some time. Mildred, moreover, had expressed a willingness to allow mother to continue visiting Aaliyah after adoption so long as mother acted appropriately. Mother thus could conceivably maintain the same affectionate closeness should mother continue with her rehabilitation after the child's adoption.
We cannot say the court abused its discretion in concluding that a mere "affectionate closeness" between parent and child during occasional visits was outweighed by the child's close bond with her primary caregiver and need for a permanent and stable home environment.

DISPOSITION
The orders are affirmed.
We concur: COOPER, P.J., and BOLAND, J.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Section 366.26, subdivision (c)(1)(A) provides an exception to termination of parental rights when parents "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."
[3] Aaliyah's alleged 19-year-old father (Abel O.) was in jail for a firearm-related offense. He was last reported to be residing in Lima, Peru and is not a part of this appeal.
[4] The juvenile court was not obliged to hear such evidence unless it comprised "relevant evidence of significant probative value to the issue." (Maricela C. v. Superior Court (1998) 66 Cal.App.4th 1138, 1147, 78 Cal.Rptr.2d 488.)
[5] Mildred was unable to travel to Dr. Kramon's office for a face-to-face interview, but Dr. Kramon interviewed her by telephone.
[6] Mother relies on Dr. Kramon's report of May 4, 2005, to show she bonded with Aaliyah. As she acknowledges, Dr. Kramon's report was not before the juvenile court when it denied her section 388 petition in April 2005.
[7] The "positive" behavior reports consisted of written commendations by St. Anne's staff, such as: "It was hard to get up this morning to go to school, but you did it, good job!! Keep it up!!," "I'm glad you take in my words, even if just for thought," "Hey[,] great job on waking up at 6:30 a.m. and attending breakfast and giving your baby a nutritional meal. Thank you!" and "Wow! I'm very impress[ed] and proud of you for being on time on going to school two days in a row."