Filed 11/16/15  In re Noah A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re NOAH A. et al., Persons Coming Under the Juvenile Court Law. | D068380 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. D.C., Defendant and Appellant. | (Super. Ct. No. J518735 A-C) |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

D.C. appeals a juvenile court judgment terminating his parental rights to his children, six-year-old Noah A., three-year-old A. A., and two-year-old I.A., and choosing adoption as the appropriate permanent plan. (Welf. & Inst. Code, § 366.26.)[1] D.C. contends the court erred in finding that the beneficial parent-child relationship exception to the adoption preference (§ 366.26, subd. (c)(1)(B)(i)) did not apply. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In July 2013, the San Diego County Health and Human Services Agency (the Agency) filed petitions on behalf of the children. (§ 300, subd. (a), (j).) The mother, B.A., used excessive discipline on then four-year-old Noah, injuring his nose and causing a contusion above the eye. D.C., who had raised Noah since infancy and was the biological father of A.A. and I.A., called the police when he found B.A. with her hands around Noah's neck, holding him six inches off the ground.[3] B.A. had been diagnosed with schizoaffective disorder with bipolar traits, but she had been off of her medication

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] To avoid repetition, we address the specific facts pertaining to the parent-child relationship exception to adoption in the discussion section.

[3] The juvenile court determined D.C. to be the alleged father of Noah A. and the presumed father of A.A. and I.A.

2

for two years. B.A. had a protective order against D.C. for an earlier domestic violence incident, but the two lived together.

The court placed the children in foster care and granted visitation and reunification services to both parents. In January 2014, the Superior Court modified D.C.'s restraining order to allow contact with B.A. Leading up to the six-month review hearing in March 2014, the Agency asked for liberal visitation, noting that both parents were "actively participating in visitation and their services." At the March 25, 2014, settlement and pretrial conference, the juvenile court found that the parents had made "substantive progress" and "based on the progress of the PARENT(S) in complying with the case plan, it appears the child will be returned home by [the] next review hearing."

On June 24, 2014, the children returned to their parents' care for a 60-day trial visit. The Agency held a Team Decision Meeting with D.C. and B.A. to establish a safety plan in the event a fight or argument escalated, or if they needed additional support. D.C. and B.A. agreed to communicate with each other and their safety network when their frustration levels reached a "3" on a scale of 0-10. Family friends agreed to check in periodically and be available if the family needed additional support.

On July 15, D.C. called Mrs. C., the former foster caregiver, to take the children for the weekend because he and B.A. were fighting. He asked Mrs. C. to take the children again on July 30, stating that he and B.A. were unable to handle all three kids, were having financial problems, and were arguing. The Agency believed the parents were "demonstrating a lack of coping skills." It expressed concern that D.C. had called Mrs. C twice in two weeks but also noted that this "demonstrated an act of protection by

3

reaching out for help and removing the kids from an escalating situation." The Agency held a second Team Decision Meeting in August to refine the safety plan. Each parent outlined the steps they would take if their frustration reached level "3." The parents agreed to weekly visits from family friends and the court-appointed special advisor (CASA). The Intensive Family Preservation Program worker increased her visits to three times per week.

Leading up to the twelve-month review hearing in September 2014, the Agency and the CASA recommended that the children remain with the parents, with six additional months of family maintenance services. The Agency reported that it was "evident in [the] current case the parents have participated in their reunification services, have demonstrated progress, can clearly articulate what they have learned, and even provide examples of how they have implemented them in their lives and within their relationship." It did, however, express concern "that the parents have continued to struggle since the children were returned to their care." The CASA reported that during her six visits to the home, D.C. "was attentive to the children, checking to see why they were fussing, picking them up, and talking to them." The CASA noted that D.C. had "successfully completed all of the steps in his service plan." Although she noted that the parents were "having trouble getting along," she recommended that the children remain with them because they had been attentive to their children's needs, and the children had been safe in their care. The court adopted the Agency's recommendations at the twelve-month review hearing on September 3, 2014.

4

One month later, the Agency filed supplemental petitions under section 387, alleging "the parents have been arguing . . . with increasing frequency and violence" since the children were placed. The children were removed on October 8, 2014, after police investigated the parents for domestic violence. B.A. told police that D.C. had threatened to shoot her three times with an air soft gun, twice on September 20, 2015, and once the next day, if she did not finish her chores.[4] She told police she knew it was not a real gun and did not want to press charges, but she wanted D.C. to move out of her apartment. The Agency determined that the children were present during at least one of the 'air soft' incidents. D.C. admitted to the social worker that he threatened B.A. with an air soft gun and threatened to slap her. He "described feeling so desperate regarding the mother that he did not know what else to do." He said he constantly had to tell B.A. to take care of the children, "and that he is always the primary caregiver." He expressed frustration that B.A. had started smoking marijuana three to four times per day and often dazed off without paying attention to the kids.

The Agency expressed concern that despite two separate safety meetings, the parents had not followed through with their safety plans or sought assistance from their support network. It stated that the " 'air soft' " incidents "clearly indicate that the level of conflict between the parents is escalating" and recommended the children to be placed in a licensed foster home, with supervised visitation for the parents. The court adopted the Agency's recommendations at the detention hearing on October 14, 2014.

---

4       The Agency's brief notes that an air soft gun is the same size and shape as a real gun but shoots "plastic BB-like pellets."

On October 30, 2014, the Agency filed an Addendum Report. "[D.C.] expressed [to the social worker] feeling like [B.A.] brings out a violent nature in him and acknowledged that this has happened several times." The Agency voiced concern that recent events "illustrate that the parents have not utilized the resources available to them and that the level of conflict between them is escalating despite their participation in over a year of services." The Agency noted that while D.C. and B.A. seemed stable on their own, they could not handle the added pressure of managing three very young kids. Moreover, while D.C. and B.A. agreed that separation would be helpful, the Agency believed they were financially and emotionally dependent on each other, making separation unlikely. D.C. understood his responsibility to protect the children but "remained living with [B.A.], indicating he ha[d] not attempted to change his circumstances in order to demonstrate a protective capacity." The Agency recommended termination of family reunification services and a section 366.26 hearing to establish a permanent plan for the children.

The court held a contested jurisdiction/disposition hearing on the Agency's section 387 petitions on January 14, 2015. The Agency's Addendum Report stated that D.C. found it painful to be separated from his children, but he and B.A. had decided to stay together. After the children were removed in October 2014, D.C. and B.A. visited them on Saturdays and requested additional visits on Sundays, which the Agency allowed. However, the foster mother stated that the parents did not consistently schedule Sunday visits, and while visits went well, the parents were not always engaged. The CASA described three visits in November and December. Noah sat at a computer and

paid little attention to D.C. during the first visit, at a public library. The parents were 30 minutes late for another visit, and Noah asked to call D.C. On another visit, all three children yelled "Daddy, Daddy" and ran to D.C. for hugs when he arrived. The parents did not visit during the holidays. The Agency concluded:

> "It is evident to the Agency that the parents love their children and that they are in pain over the children's second removal from their care. However, the parents have not taken any steps to mitigate the safety concerns that caused the subsequent removal . . . [or] demonstrated any new circumstances to indicate that there has been any progress or change that would indicate they could care for the children without further incidents of fighting, arguing, or domestic violence."

The court adopted the Agency's recommendations and sustained the section 387 petitions. The court placed "great significance" on the fact that the B.A. called the police after the 'air soft' incidents, stating that this demonstrated that violence had escalated and neither had followed the safety plan. Noting that the parties had reached the 18-month mark and that the children had spent a significant amount of time outside the parents' custody, the court terminated the parents' reunification services, ordered the children to continue in foster care, and scheduled a section 366.26 hearing to set a permanent plan. The court granted continued supervised visitation for the parents. D.C. filed a notice of intent to file a writ petition, but this Court dismissed the petition after D.C.'s counsel found no viable issues for review.

Between January and June 2015, D.C. attended 14 of 19 supervised visits—he canceled three times, and the foster caregivers and family visitation center each canceled once. The Agency and the CASA noted that D.C. appeared to have a close bond with the

7

children, particularly with Noah. The Agency noted that "the parents truly love their children" and "are heart[]broken that the case has come to this point." The Agency and the CASA also noted that the children were "happy and well[]cared for in their current placement" and "appear[ed] to be thriving." On May 11, 2015, the court granted de facto parent status to the foster caregivers, who had cared for all three children since October 23, 2014.

In June 2015, the juvenile court held a section 366.26 hearing. The Agency recommended adoption, noting that the de facto parents wanted to adopt all three children as a sibling set. The de facto parents joined the Agency's argument, stating that they remained "absolutely committed" to adopting the children. B.A. submitted on the Agency's recommendations. D.C. opposed adoption under the beneficial parent-child relationship exception (§366.26, subd. (c)(1)(B)(i)), stating that he had maintained visitation and Noah expressed his preference to remain with him. Counsel for the children stated that while Noah wanted to live with his parents, it was in the best interests of all of the children to terminate D.C.'s parental rights to allow for adoption. The Agency noted: "[i]t is clear, and I think everyone in this room would agree, that [D.C.] cares very much about his children"─but stated that the children looked to the de facto parents to fulfill their parental needs.

The court concluded that all three children were generally and specifically adoptable. It determined that D.C. had failed to make consistent visitation with his children and that his parental bond was not substantial enough to outweigh the benefits to the children of having a permanent home. Accordingly, the court held that the exceptions

8

set forth in section 366.26 subdivision (c)(1)(B) to adoption did not apply and found adoption to be in the best interests of all three children by clear and convincing evidence. D.C. filed a timely notice of appeal.

STANDARD OF REVIEW

On appeal, we review the trial court's order terminating D.C.'s parental rights for substantial evidence, "considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*); see *In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).)[5]

DISCUSSION

"[A] parent and a child share a fundamental interest in reuniting up to the point at which reunification efforts cease. [Citation.] However, the interests of the parent and the child have diverged by the point of a .26 hearing to select and implement a child's permanent plan." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) "Consequently,

---

[5] Courts are divided on the appropriate standard of review for orders denying the beneficial parent-child relationship exception and terminating parental rights. Most courts have reviewed for substantial evidence. (See, e.g., *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *C.F.*, *supra*, 193 Cal.App.4th at p. 553.) Others have reviewed for abuse of discretion. (See, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*); *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449 (*Aaliyah R.*).) Still other courts have applied a hybrid standard, applying the substantial evidence standard to review the existence of a beneficial relationship and an abuse of discretion standard to review whether that relationship constitutes a "compelling reason for determining that termination would be detrimental to the child." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; see *J.C.*, *supra*, 226 Cal.App.4th at p. 531.) As noted by *Jasmine D.*, "[t]he practical differences between the two standards of review are not significant." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) We affirm under any of the above standards.

9

after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability." (*Ibid.*)

"At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship, or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans. [Citation.] [¶] Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297 (*S.B.*).) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350, italics added.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to termination of parental rights where "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." This exception "will apply only where the parent has demonstrated the benefits to the child of continuing the parental relationship outweigh the benefits of permanence through adoption." (*J.C.*, *supra*, 226 Cal.App.4th at p. 533.)

10

D.C. argues the juvenile court erred in terminating his parental rights at the section 366.26 hearing.[6] Citing *Autumn H.* and *S.B.*, he claims he had a "substantial, positive, and emotional" relationship with the children, particularly Noah, such that severing the parent-child relationship would be detrimental. We disagree. Although there is no question that D.C. and Noah shared a special bond, there is substantial evidence to support the juvenile court's ruling that this relationship did not outweigh the benefits of adoption for all three children.

I

REGULAR VISITATION

To establish the beneficial parent-child relationship exception, D.C. must show that he "maintained regular visitation and contact with the child[ren]." (§ 366.26 (c)(1)(B)(i).) Sporadic visitation is insufficient to satisfy this prong. (*C.F.*, *supra*, 193 Cal.App.4th at p. 554.) Inconsistent visits in the months leading up to the section 366.26 hearing cannot be overcome by consistent and positive visits during an earlier period of time. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396.) Likewise, inconsistent visitation that becomes consistent shortly before the section 366.26 hearing is not sufficient. (*Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 450.)

The parties disagree as to whether D.C. maintained consistent visitation with the children. The court concluded that he did not. The record suggests that D.C. was

---

6       At the section 366.26 hearing, D.C. argued that the Agency had not demonstrated that the children were adoptable. The court found otherwise, and D.C. does not challenge adoptability on appeal.

11

initially inconsistent with visitation but became significantly more consistent in the months leading up to the June 2015 section 366.26 hearing.

On October 8, 2014, the children were removed for the second time from their parents' care. The record does not include a complete list of visits between October 2014 and February 2015, but it reflects that the parents were no-shows for one visit, 30 minutes late to another, and failed to schedule visits during the children's holiday break. In December 2014, D.C. and B.A. requested one additional visit per week, on Sundays. Although the social worker approved this request, the record reflects that the parents did not regularly schedule weekend visits. While the foster caregivers encouraged the parents to call their children during the week, the parents did not do so.

The juvenile court terminated the parents' reunification services on January 14, 2015, and scheduled a section 366.26 permanency planning hearing. The court allowed both parents to continue supervised visitation. From February 7 to April 18, D.C. attended seven out of eleven scheduled visits. He cancelled three visits, twice at the last minute and without explanation. The family visitation center cancelled the fourth visit due to too many no-shows. The foster caregiver expressed in March that the children had become used to the parents' no-shows.

Thereafter, D.C. (but not B.A.) became significantly more consistent with visitation. From April 25 to June 13, he did not cancel a single visit, although the foster caregiver canceled once. D.C. attended seven out of eight visits during this period. He was late to two visits, but he was also early once.

12

We conclude there is substantial evidence that D.C. did not maintain consistent visitation with his children after they were removed for the second time. (Cf. *S.B.*, *supra*, 164 Cal.App.4th at p. 295 [father made consistent visitation with the child "two to three times each week"].) Although D.C. became more consistent with visitation as the section 366.26 hearing neared, this does not suffice. (*Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 450.)

## II

## WEIGHING THE BENEFICIAL RELATIONSHIP

Even if D.C.'s visitation were deemed consistent, there is substantial evidence to support the juvenile court's conclusion that the father did not satisfy the second prong of section 366.26, subdivision (c)(1)(B)(i).

Although courts have recognized that "[p]arent-child relationships do not necessarily conform to a particular pattern," (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350), "for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468 (*Angel B.*).) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).)

"The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and

13

shared experiences." (*K.P.*, *supra*, 203 Cal.App.614 at p. 621.) While day-to-day contact is not necessarily required, courts evaluate whether the parent has the *type* of relationship that typically arises from day-to-day interaction, companionship, and shared experiences. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 (*Casey D.*).) "That showing will be difficult to make in the situation, such as the one here, where the parents have . . . [not] advanced beyond supervised visitation." (*Ibid.*) At the same time, a parent does not need to show that his child has a " 'primary attachment' "─"[t]he exception may apply if the child has a 'substantial, positive emotional attachment' to the parent." (*S.B.*, *supra*, 164 Cal.App.4th at p. 299.)

The Agency argues D.C. did not occupy a parental role with his three children. We disagree. While the social worker and the CASA assessed the relationship between D.C. and the children as akin to a "friendly visitor" or "playmate," the juvenile court concluded that the father had a parental bond with all three children. The court held that the beneficial parent-child exception did not apply, however, because the bond was not "so substantial, so positive, or so emotional" as to outweigh the benefits of permanency through adoption. There is substantial evidence to support the juvenile court's conclusion.

Pursuant to section 366.26, subdivision (c)(1)(B)(i), a parent must show that the strength and quality of his parent-child relationship *outweighs* the security and sense of belonging the child would gain in a permanent home with new, adoptive parents. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such

14

that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) "The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist." (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.)

As to the younger children, A.A. was only one year old when dependency proceedings began in July 2013; her brother I.A. was only one month old. By the time of the section 366.26 hearing, A.A. had spent less than half of her three years living with D.C. I.A. had spent less than one fourth of his two years with D.C., which was less than he had spent with his de facto parents. A.A. and I.A.'s young age and limited time in parental custody weigh against finding a "substantial, positive emotional attachment." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; see *Angel B.*, *supra*, 97 Cal.App.4th at p. 467 ["The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs."].)

A.A. and I.A. did greet D.C. with excitement, shouting "Daddy, Daddy!" when they saw him. They gave their parents hugs and kisses when it was time to say goodbye. A.A. and I.A. turned to B.A. for consolation during one visit, when they fell on the playground. D.C. helped B.A. change diapers and gave snacks to A.A. and I.A. He admonished her to keep a better eye on I.A. when he put things in his mouth or climbed a play structure. He gave I.A. a time-out once, when he dumped out his toys. The juvenile

court declined to characterize the parents as "friendly visitors," stating: "You obviously relate to them as parents. You in particular, [D.C.]."

However, for the beneficial parent-child relationship exception to apply, it is not enough for a parent to have a loving and affectionate relationship with the child. (*J.C.*, *supra*, 226 Cal.App.4th at p. 529.) D.C. had the burden to show the type of relationship that typically arises from day-to-day interaction, companionship, and shared experiences. (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) The record does not support that type of relationship with the younger children. A.A. and I.A. went easily to their caregivers at the end of visits. When D.C. cancelled at the last minute, A.A. and I.A. continued to play in the hallway, whereas Noah asked "why." The social worker remarked that although A.A. and I.A. were too young to state their feelings on adoption, both seemed to get excited on seeing the caregivers. On one occasion, A.A. shouted "daddy" and ran to the foster father when he returned from work. There is sufficient evidence to support the juvenile court's ruling that D.C.'s relationship with A.A. and I.A. was not "so substantial, so positive, or so emotional" as to meet this exception. (Compare *J.C.*, *supra*, 226 Cal.App.4th at pp. 533-534 [mother failed to establish substantial positive attachment with toddler, who easily separated from mother at the end of visits] with *S.B.*, *supra*, 164 Cal.App.4th at p. 298 [applying exception where child "was unhappy when the visits ended and tried to leave with [the father] when the visits were over"].)

Noah presents a closer case: D.C. and Noah clearly shared a special bond. As Noah's attorney acknowledged at the section 366.26 hearing: "Noah's position is that if

16

he could, he would like to live with his parents. That is his position." Similarly, the Agency explained in its section 366.26 report:

> "[The social worker] has spoken to Noah about permanency on a few occasions. In general, Noah indicated that he wants to live with his father [D.C.] . . . . [The social worker] asked Noah how he would feel about living with his current caregivers forever. The first time Noah was asked that question, he replied 'fun', and then said he wants to live with his dad [D.C.]. . . . He said [D.C.'s] house is his first house and he likes his toys there. Noah indicated that he likes his current caregivers but he wants to live with [D.C.]. . . . [The social worker] asked Noah how he would feel if he could not live with his dad [D.C.] or his mom [B.A.] again. He said he would be angry and sad." [7]

The Agency noted that D.C. and Noah spent "a significant amount of time with each other during supervised visits," and Noah usually expressed wanting to live with him. After D.C. cancelled visits in February and April, Noah asked "why." When his parents were late for a visit in December 2014, Noah asked to call D.C. The Agency noted: "A couple times, Noah wanted to go home with one or both his parents after a visit." For example, after the March 15 visit, while his siblings ran to the caregivers and got into their car, "Noah stayed behind with [D.C.]," and the two hugged. Without question, Noah had a parental relationship with D.C. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The juvenile court found a parental bond between D.C. and Noah but concluded that it was "not so substantial, so positive, or so emotional" as to "outweigh the benefit to

---

[7]     While the juvenile court was required to consider Noah's wishes, it was also required to act in his best interests. (§ 366.26, subd. (h)(1).) "[A] child's wishes are not necessarily determinative of the child's best interest" (*In re C.B.* (2010) 190 Cal.App.4th 102, 125).

Noah of having a permanent home."  On appeal, we conclude there is substantial evidence to support the juvenile court's conclusion, and we will not disturb it.

Noah developed a close relationship with his de facto parents, who have cared for him since his second removal in October 2014.  It was Noah's idea to call his de facto parents "mommy" and "daddy."  Two weeks before the section 366.26 hearing, Noah stated that he would "feel sad" if he could never live with his parents, but he would feel "happy" if he could live with his de facto parents forever.  He also said that he would be "angry" if he could not continue living with his caregivers.  The Agency reported that Noah's caregivers were actively engaged in his therapy, and Noah "sees his current caregivers as a place of safety."  The Agency reported that the children were "doing well in their current placement," and all three had "developed a healthy relationship with their caregivers [the de facto parents]."  It concluded that their current caregivers were "willing and able to provide the permanency, safety and well-being that these children need."  The CASA agreed, stating that all of the children "appear[ed] to be thriving" under the care of their de facto parents, who were fully committed to adopting them.  We conclude that substantial evidence supports the juvenile court's conclusion that the strength and quality of D.C.'s relationship with Noah did not outweigh the benefits to Noah of permanency through adoption.

We find support in *In re Cliffton B.* (2000) 81 Cal.App.4th 415 (*Cliffton B.*).  In that case, two-year-old Cliffton was removed because of his father's drug and alcohol abuse.  (*Id.* at p. 419.)  The father followed his case plan for twelve months, and the juvenile court released Cliffton for a 60-day trial visit.  The father relapsed, and the court

sustained the Agency's section 387 petition and set a permanency hearing. (*Id.* at p. 420.) The father visited Cliffton weekly for two hours in the months leading up to the section 366.26 hearing. The social worker reported " 'a very warm affectionate relationship between the father and the child' " and stated that "Cliffton's reaction to Carl was 'equally warm and responsive.' " (*Id.* at p. 421.) She expressed concern, however, at the father's relapse during the 60-day trial visit. "She acknowledged terminating parental rights would have 'some negative effect' on Cliffton, but the risk of being removed from his family again outweighed the value of that relationship." (*Id.* at p. 422.)

The juvenile court concluded that the father had maintained consistent visitation and expressed " 'no doubt that both parents love Cliffton deeply.' " However, it concluded that the father had not demonstrated that the strength and quality of his relationship with his son outweighed the benefit of a permanent home with adoptive parents. (*Cliffton B.*, *supra*, 81 Cal.App.4th at pp. 422-423.) On appeal, the father noted that Cliffton called him "daddy" and ran to him for hugs and kisses. He also cited the social worker's conclusion that terminating the relationship would involve some risk to Cliffton. (*Id.* at p. 424.) The Court of Appeal held that it was "a very close case," and despite "the artificial restraints created by monitored weekly visitation, [the father] has maintained a significant relationship with Cliffton." (*Ibid.*) However, it concluded that there was substantial evidence to support the juvenile court's decision that the balance weighed in favor of adoption. Cliffton was young and had adjusted to his foster family,

19

who were willing to adopt him. A different ruling would risk further disruption in Clilffton's life. (*Id.* at p. 425.)[8]

While Noah and D.C. clearly shared a close bond, so did Noah and his de facto parents. As in *Cliffton B.*, there is sufficient evidence to support the juvenile court's decision that the balance weighed in favor of adoption.[9]

D.C. cites *S.B.*, but in that case, both a bonding study and a social worker concluded that there would be some detriment and potential harm to the child were she to lose the parent-child relationship. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 295-296.) The child in *S.B.* saw the father two to three times per week and "derived comfort, affection, love, stimulation, and guidance from her continued relationship with [him]." (*Id.* at p. 300.) Likewise, other courts have applied the beneficial parent-child relationship exception where evidence from the Agency, the CASA, or a bonding expert shows that the parent and child have a significant bond and that termination would cause great harm.

_____

[8] Similarly, in *G.B.*, the court concluded that although the mother cared "deeply" for her children and visits went well, the evidence "fell short" of meeting the beneficial parent-child relationship exception where the balance weighed in favor of adoption. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 ["Mother's visits with her children were always supervised, mother was only at the beginning stages of working on the effects of domestic violence in her life, and there was still instability and dysfunction surrounding her relationship with father. By contrast, the children were in a secure placement and were bonded with their current and prospective caregivers."].)

[9] We also note that while Noah's current caregivers were interested in adopting all three siblings together, they were not interested in legal guardianship. Applying the exception to Noah would risk separating him from his half siblings. (See *Angel B.*, *supra*, 97 Cal.App.4th at p. 468 ["if Mother's parental rights were *not* terminated, Angel would be denied a permanent, stable adoptive family with her own sibling, something that the Legislature *has* determined to be detrimental"].)

20

(*In re Amber M.* (2002) 103 Cal.App.4th 681, 690 ["The common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA is a beneficial parental relationship that clearly outweighs the benefit of adoption."]; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207 [psychologist found "a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond"]; *In re Scott B.* (2010) 188 Cal.App.4th 452, 472 ["[T]he CASA opined, and the record clearly shows, that it would be detrimental to Scott for his relationship with Mother to be disrupted . . . [as] [¶] Mother provides stability to Scott's life."].) D.C. did not request a bonding study, and although the CASA and the Agency acknowledged Noah's bond with D.C., both recommended adoption without reservations.[10]

_____

[10] The Agency concluded that although D.C. behaved appropriately with his children during visits, he had not taken any steps to ameliorate the conditions that led to the children's subsequent removal. D.C. missed visits, failed to enroll in conjoint therapy, and continued to live with B.A. despite his history of domestic violence and admission that she brought out violent tendencies in him and made him feel "desperate." Several courts consider whether the parent overcame the problems that led to the child's dependency proceedings. (See, e.g., *Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1351-1352 ["The benefit of a stable, permanent adoptive home for [the child] clearly outweighed the benefit of a continued relationship with [the mother], who despite her successful visitation record had made no steps toward overcoming the problems leading to [the child's] dependency on the juvenile court."]; *C.F.*, *supra*, 193 Cal.App.4th at p. 558 [The mother "did not maintain her sobriety. She resumed drug use and lost custody of her children after the reunification period ended."].) D.C. is correct that at the permanency hearing stage, reunification is no longer at issue. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) However, the aforementioned cases consider the parent's postremoval conduct in order to evaluate the strength and quality of the parent-child bond. (See, e.g., *S.B.*, *supra*, 164 Cal.App.4th at p. 300 [the father's "devotion to [the child] was constant, as evidenced by his full compliance with his case plan and continued efforts to regain his physical and psychological health."].)

The de facto parents have provided Noah, A.A., and I.A. with a stable home since October 2014, and are firmly committed to adopting them.  At the section 366.26 hearing, the de facto parents stated that "they do intend to maintain visitation with [D.C.]." Although D.C. loves his children and the children enjoy their visits, they are happy where they are, and there is substantial evidence to support the juvenile court's decision that the beneficial parent-child relationship exception to termination does not apply.

DISPOSITION

The judgment is affirmed.


NARES, J.

WE CONCUR:


BENKE, Acting P. J.


PRAGER, J.*

---

*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.