Filed 3/23/16  In re A.C. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.C., A Person Coming Under the Juvenile Court Law. | B266597 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK80358) |
| Plaintiff and Respondent, | |
| v. | |
| W.R. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Philip L. Soto, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant W.R.

Lisa A. Raneri, under appointment by the Court of Appeal, for Defendant and Appellant R.C.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \*

In July 2013, then 18-month-old A.C. was removed from mother W.R. due to mother's substance abuse. For over two years, A.C. remained a dependent while mother attempted, without success, to address her substance abuse problem. Mother visited A.C. regularly, but he was never returned to her, and her visitation never progressed beyond monitored visitation. For nearly the entire dependency, A.C. was placed in a foster home where he thrived, with foster parents who were committed to adopting him. Two years into the dependency, mother made a Welfare and Institutions Code section 388[1] petition, seeking placement of A.C. with paternal aunt, P.L. The juvenile court ordered the Los Angeles County Department of Children and Family Services (Department) to investigate placement with paternal aunt. However, after the investigation was concluded, the juvenile court determined it was not in A.C.'s best interests to be removed from the foster home where he was thriving. Following a contested section 366.26 hearing, mother's and father's parental rights were terminated. Mother appeals these orders, and father R.C. appeals the decision denying placement with paternal aunt. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2013, the Department received a general neglect referral for A.C., based on mother's use of marijuana in A.C.'s presence. The Department social worker interviewed mother on June 4, 2013. Mother admitted to smoking marijuana while A.C. napped. She also admitted to using methamphetamines with father. Father was incarcerated, and had only "random visits" with A.C. The Department's search of an "inmate locater" website revealed that father was housed in Wasco state prison. Mother agreed to submit to an on demand drug test on June 5, 2013.

Mother did not appear for her on demand drug test. The test was rescheduled for June 13, 2013, but mother missed this test, and social workers were unable to reach her by phone. On June 27, 2013, the social worker contacted the building manager for mother's apartment, and learned that mother had not paid rent and had "disappear[ed]."

---

[1]    All statutory citations are to the Welfare and Institutions Code.

The social worker was given access to the apartment, and confirmed that most of mother's and A.C.'s belongings had been removed.

Because mother fled during the Department's investigation, the Department obtained a protective custody warrant for A.C. and a no bail arrest warrant for mother. The Department also filed a petition under section 300, subdivision (b) based on mother's substance abuse. Mother and A.C. did not appear at the July 3, 2013 detention hearing, and A.C. was ordered detained.

Mother had not been located as of the August 12, 2013 jurisdiction and disposition report. The report included additional information about father. He had been sentenced in 2012 to a six-year prison term for burglary. On July 25, 2013, a Department social worker contacted the "litigation coordinator" at father's prison, and was informed that father "is housed in the reception center and he is not able to talk on the telephone." Father had not been assigned to a facility because of several infractions that prevented him from being "clea[r]ed by the disciplinary committee." A copy of the petition and notice of the hearing on the petition were sent to father at Wasco State Prison on July 29, 2013. Father signed a waiver of his right to appear at the jurisdictional hearing.

Mother appeared at the August 12, 2013 jurisdictional hearing. The court recalled the warrants, found father to be the presumed father, and ordered that mother's visitation was to be monitored. The hearing was continued until September 25, 2013. A.C. was placed in foster care that same day.

When mother was interviewed on August 15, 2013, she explained that she missed her drug test because she was arrested for petty theft and was in custody. Mother admitted to using methamphetamine before she became pregnant, and that she smoked marijuana daily. She tested positive for marijuana on August 23, 2013.

The Department's September 25, 2013 addendum report noted that mother wanted A.C. to be placed with maternal grandmother, or with an unrelated "extended family member," Y.F. Mother visited with A.C. three times a week. The visits were monitored by A.C.'s foster mother.

The continued jurisdictional hearing was held on September 25, 2013. Mother filed a waiver of rights and pled no contest to the petition. The court ordered mother to participate in a full drug and alcohol program with aftercare, random or on demand drug testing, an NA step program and sponsor, parenting classes, and individual counseling to address case issues. Her visitation was to remain monitored, but the Department had discretion to liberalize the visits. The court bypassed reunification services for father under section 361.5, subdivision (e), based on his lengthy prison term.

According to the September 19, 2013 Multidisciplinary Assessment Team findings, A.C. remained placed with the same foster family, Mr. and Mrs. P., and he was "doing very well there." The foster home was "loving" and provided A.C. with "a stimulating and nurturing environment." Mother had been consistent with her visits and was "very loving and nurturing." Mother got along well with the foster mother during the visits. A.C.'s foster parents were "willing to keep [A.C.] long term if needed but are supportive of mother and reunification as well."

According to the Department's March 26, 2014 status review report, mother had enrolled in a program with El Proyecto De Barrio in September 2013. However, a January 3, 2014 progress report revealed that mother was not in compliance with the group and individual therapy sessions or sponsorship aspects of the program, and had tested positive for marijuana on November 14 and December 30, 2013. Mother also had numerous "no shows" for drug tests. Mother was discharged from the program for having "excessive positive toxicology test results for illicit drugs."

On March 6, 2014, mother reported that she enrolled in her second program, Twin Town Clinical Dependency Outpatient Program.

The Department's March report also noted that A.C. had been placed with maternal great-grandparents on September 25, 2013. However, on September 30, 2013, mother and maternal great-grandmother asked that A.C. be returned to his original foster family because "they were not going to be able to work together." Mother failed to comply with visitation rules and "continuously engaged in hostile verbal altercations with maternal great grandparents." The Department "assessed other relatives to care for

4

[A.C.] and unfortunately there are not available appropriate relatives . . . ." A.C. was returned to Mr. and Mrs. P. on December 4, 2013.

Mother continued to regularly visit A.C. However, the visits were "poor" because she had to be counseled not to feed him junk food throughout the entire visit. Mother's visits remained supervised by both A.C.'s foster mother and a Department social worker, so that the Department could "coach" mother during visits about appropriate eating habits. A.C. was bonded with mother and also had formed a bond with his foster parents. Mr. and Mrs. P. remained willing to adopt A.C.

At the March 26, 2014 status review hearing, the court gave the Department discretion to place A.C. with mother or an appropriate relative. The court found that mother was only in partial compliance with her case plan.

As of the September 23, 2014 status review report, A.C. remained with his foster parents, Mr. and Mrs. P. On May 13, 2014, mother had been discharged from her second outpatient drug treatment program due to excessive absences and positive drug tests. The Department referred mother to Tarzana Treatment Center, and she enrolled in an outpatient program on July 24, 2014. However, her attendance was poor and she did not submit to random drug testing. She was a "no show" for seven tests between May 2014 and August 2014. Because mother's housing situation was unstable, the Department social worker suggested that mother consider sober living or a residential treatment program, but mother was not interested.

The Department attempted to assess maternal grandmother as a caregiver for A.C., but maternal grandmother did not want A.C. placed with her. A.C. was bonded to mother, but his bond to his foster mother was "stronger." He called Mrs. P. "mami" and asked for her at the end of visits with mother. Mother would excessively hug and kiss A.C. during visits, and had to be counseled to not give in to every one of A.C.'s demands. A.C. would tell mother to "leave [him] alone." Mother was visiting A.C. regularly, but "rarely demonstrates [an] appropriate parental role and she rarely demonstrates knowledge about [the] child's development." Mother "continuously struggle[d] with providing structure" during her visits with A.C. Mother also struggled to follow the

5

Department's and foster mother's directions about giving food to A.C.  Mother was observed to have "poor parenting skills."  A.C. was very respectful of his foster mother, but hostile with mother.  However, A.C. enjoyed his visits with mother.

A.C. continued to thrive in his foster placement.  Mrs. P., a former preschool teacher, had diligently worked on enhancing A.C.'s vocabulary.  Mr. and Mrs. P. had an approved adoptive home study and remained committed to adopting A.C. if mother failed to reunify.

On September 17, 2014, foster mother filed a "caregiver information form" with the court noting that A.C. would display troubling behaviors after visits with mother, such as defiance and throwing tantrums when asked to follow simple house rules.

At the September 23, 2014 status review hearing, the court continued mother's reunification services, finding her to be in partial compliance with her program.

According to the Department's February 11, 2015 status review report, Tarzana Treatment Center accepted mother into its inpatient treatment program in September 2014, but mother refused to attend.  Mother left the Tarzana Treatment Center program and enrolled with her fourth program, Via Avante's inpatient program, on November 13, 2014.  However, she was discharged on January 30, 2015, for failing to follow the program's rules and for "jumping a gate" and leaving the facility without permission.  Mother was transferred to another inpatient program, FreeHab, which had less structure and rules.

Mother had several good visits with A.C. during October and November 2014.  A.C. was very comfortable with mother, but was not upset when the visits ended.  Mother appropriately disciplined A.C. with a time-out during one visit for not following her instructions.  She demonstrated "good knowledge of parenting skills" during these visits.  A.C. told the social worker he enjoyed his visits with mother.  Mother had a brief interruption in her visits with A.C. while living at Via Avante, due to her negative behaviors in the program.  Once her behavior improved, she was allowed to visit with A.C.

The Department's visits to A.C.'s foster home showed A.C. to be a very happy and well-adjusted child. Mrs. P. reaffirmed her commitment to adopting A.C. She reported that A.C. would often have tantrums after visits with mother.

The Department recommended termination of mother's reunification services.

At the February 20, 2015 permanency review hearing, more than 18 months after A.C. was detained, the court terminated mother's reunification services. A section 366.26 hearing was set for June 18, 2015. Father was not present at the hearing, and a notice of the parents' writ rights was sent to mother, but not to father.

On May 28, 2015, counsel made a special appearance on father's behalf. The court instructed counsel to "contact father and see if he wants representation" and the Department was ordered to prepare a jail removal order to secure father's presence at the section 366.26 hearing.

On June 11, 2015, father filed a section 388 petition, contending the court erroneously found that father had received proper notice of the August 12, 2013 jurisdictional hearing, and that no signed waiver of his appearance had been obtained. Father asked the court to vacate the jurisdictional findings and to set the matter for adjudication. The court set the section 388 petition for hearing on July 6, 2015.

On June 15, 2015, mother filed a section 388 petition asking that A.C. be returned to her or placed with relatives. She argued that she had completed a 12-week parenting class, and had stable housing and employment. Her petition also was set for hearing on July 6, 2015.

The Department's section 366.26 report noted that mother generally visited A.C. regularly. The visits went well, and mother was good at redirecting A.C. when necessary. However, mother still struggled to set healthy boundaries for A.C., and would often overfeed A.C. A.C. had become upset when one visit was ending, and was upset when mother missed a visit due to transportation issues. However, A.C. was also anxious to see Mrs. P. after visits with mother. Mother would always bring snacks, toys, and activities to the visits, and A.C. would reach for a snack or toy before greeting mother.

The report noted that Mr. and Mrs. P. "have a close and loving relationship" with A.C., and that they remained committed to adopting him.

On April 10, 2015, father signed a "statement regarding appearance at hearing" indicating that he wanted to be physically present at the section 366.26 hearing, and that he wanted to be represented by counsel at the hearing. Father also sent a letter to the Department stating that he did not want to lose his parental rights and did not want his son to be adopted. He had received "a couple notices that [he] did not fully understand" from the Department. He expressed that his sister had wanted custody of A.C., but that mother was against it so A.C. had been placed with maternal relatives. Father had not participated in court proceedings because he had disassociated from his gang, and was concerned that he would be assaulted at the Los Angeles County Jail. He did not understand how serious the case was, and believed that A.C. was still placed with family members.

Mother filed a second section 388 petition on June 18, 2015, seeking reinstatement of reunification services or placement of A.C. with paternal aunt, P.L. Mother stated she had enrolled in the Cri-Help drug rehabilitation program. The petition was also set for hearing on July 6, 2015.

Father was present at the June 18, 2015 section 366.26 hearing. The court continued the hearing to July 6, 2015, because father's counsel was just getting involved in the case, and ordered that father could appear telephonically at the continued hearing. Both mother and father indicated that they wanted paternal aunt, P.L., to be considered for placement. When the court asked why she had not been identified earlier, mother said it was her fault because she was having her "own issues." Mother regretted not suggesting paternal aunt sooner. The court agreed that possible relative placements should be investigated for placement and visitation.

On July 1, 2015, the Department filed a last minute information for the court. Paternal aunt and her partner had submitted for a LiveScan, and an inspection of their home would be completed once the LiveScan results were received. According to the Department, paternal aunt had been considered for placement at the outset of the case, but

8

mother was "adamant" that A.C. should not be placed with paternal aunt. Mother told the Department she had no relationship with paternal relatives. According to paternal aunt, she lost contact with mother after A.C. was placed with maternal relatives because mother changed her phone number and never reached out to paternal relatives. It had not occurred to paternal aunt to ask the Department for visitation with A.C. because she believed mother had reunified with A.C. Paternal aunt would like to start visiting A.C. and to have him placed with her.

On July 6, 2015, the Department filed a report in response to mother's section 388 petitions. The Department contacted Cri-Help, and was told that mother was not enrolled there.

At the July 6, 2015 hearing, father appeared by telephone and withdrew his section 388 petition. His counsel made no mention of other notice issues in the case as to father. The court consolidated mother's section 388 petitions, as they sought substantially the same relief. Counsel stipulated that mother would testify that she had enrolled in Cri-Help and did not know why a Cri-Help representative would have said she was not enrolled there. Counsel argued that mother had changed her mind about having A.C. placed with paternal relatives.

Father's counsel argued that the Department failed to investigate placement with paternal relatives, and did not discuss with father the possibility of placing A.C. with his family. Father read a letter into the record, asking the court to place A.C. with paternal aunt. According to the letter, paternal aunt had contacted the social worker early in the case.

The court granted mother's section 388 petition in part, and ordered the Department to evaluate paternal aunt for placement of A.C. The court continued the section 366.26 hearing until August 31, 2015. The court also granted Mr. and Mrs. P.'s request for de facto parent status.

An August 31, 2015 status review report noted that A.C. was thriving in his foster placement, and that he had a strong bond to his caregivers. A.C. was also bonded with mother, but his bond with his foster parents was stronger. Paternal aunt had started

9

visiting with A.C., but was unable to form a bond with A.C. because mother was present at these visits. An ASFA[2] inspection of paternal aunt's home was scheduled for August 28, 2015.

A.C. viewed his visits with mother as "play time." A.C. told the social worker he wanted to stay with his foster parents "for always." He also reported that he enjoyed visiting with mother because he "plays and eats." He was unsure if he wanted to continue visiting with paternal aunt.

The Department's report explained that it had considered relative placements early in the dependency, but mother's hostile behavior made such placements unworkable. Paternal aunt had contacted the Department in October 2013. Mother did not want A.C. placed with paternal aunt, and when the Department informed paternal aunt of this, she did not pursue visitation with A.C.

The Department's August 31, 2015 last minute information for the court noted that paternal aunt's home had been inspected, and that it was found to "meet ASFA standard[s]." The home was safe and appropriate, with a bedroom already furnished for A.C.

The section 366.26 hearing was held on August 31, 2015. The court first considered the placement issue raised by mother's section 388 petition. Paternal aunt had visited with A.C. four or five times, for two hours each visit. Mother testified that she did not want A.C. placed with paternal aunt in 2013 because of her "own issues" and because she was "deep in [her] addiction." Mother even changed her number so paternal relatives could not contact her. Mother admitted that she had unfairly tried to keep the paternal relatives away from A.C.

Father testified at the hearing. He thanked Mr. and Mrs. P. for caring for A.C., but was concerned that as A.C. got older, he would miss his biological family and feel "lost"

---

[2]    The federal Adoptions and Safe Families Act (ASFA) of 1997 has requirements for the approval of relative caregivers with which California agencies must comply. (See <http://www.dss.cahwnet.gov/lettersnotices/entres/getinfo/acl00/pdf/00-85.PDF> [as of Mar. 23, 2016].)

and "confused" if the P.'s were allowed to adopt him. Father's counsel argued that A.C. should be placed with family.

Paternal aunt testified that she contacted the Department in 2013 about having A.C. placed with her. The social worker informed her that mother did not want A.C. placed with paternal relatives, but paternal aunt made clear that she was interested in having A.C. placed with her. The Department social worker told paternal aunt that the Department was abiding by mother's wishes, and that there was nothing further paternal aunt could do. Paternal aunt did not pursue visitation with A.C. because she did not know she could. She was willing to adopt A.C.

The court concluded that mother's conduct prevented paternal relatives from being considered for placement, and given her disruptive behavior towards her own family members, the Department had no option but to place A.C. with Mr. and Mrs. P. The court concluded it was not in A.C.'s best interest to remove him from his home of nearly two years. The court acknowledged that it was unfair that mother's conduct prevented father's family from proper consideration, but at this point in the proceedings, A.C.'s needs were paramount. Therefore, the court denied placement with paternal aunt.

As to the termination of her parental rights, mother argued that the beneficial relationship exception applied given the positive nature of her visits with A.C. The court found that mother did not occupy a parental role and was instead a "friendly visitor." The court found the exception did not apply, and terminated mother's and father's parental rights. Mother and father timely appealed.

## DISCUSSION

Mother contends the juvenile court erred in terminating her parental rights, reasoning there was substantial evidence that she maintained regular visitation and shared a beneficial parent-child relationship with A.C. Alternatively, mother contends the juvenile court abused its discretion when it denied her section 388 petition to have A.C. placed with paternal aunt. Father has also appealed, joining mother's argument that A.C. should have been placed with paternal aunt. Father acknowledges that he has not challenged the termination of his parental rights, and that this court may therefore find he

11

lacks standing to challenge the placement order. However, father urges this court to reach the placement issue on the basis that he "extensively litigated" the issue below, and that this appeal is his first opportunity to challenge the placement issue because he was not given a writ advisement following the setting of the section 366.26 hearing.

## 1.    Termination of Parental Rights

If the court finds that a child should remain out of the custody of the parent and has terminated reunification services, the court shall terminate parental rights unless the court finds that termination would be detrimental to the child. One such circumstance exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show that termination of parental rights would be detrimental. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "To meet the burden of proof for the section 366.26, subdivision (c)(1)[(B)(i)] exception, the parent must show more than frequent and loving contact or pleasant visits. [Citation.] . . . [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. [Citations.]" (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953-954.) The relationship between the parent and child must be sufficiently significant that the child would suffer detriment from its termination. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) The court must balance the strength and quality of the parent-child relationship against the security and sense of belonging that a stable family would confer on a child. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.) "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250.)

Although mother regularly visited A.C, all of her visits were monitored. A.C. seemed to enjoy his visits with mother, but mother seldom acted like a parent during her visits with A.C., and A.C. viewed his visits with mother as play time and time to eat, and was not upset when visits concluded. A.C. had been in foster care for more than half of his life, and was thriving in his adoptive placement. He displayed troubling behaviors

12

after visiting with mother. Even though A.C. shared a bond with mother, this bond did not outweigh the benefits A.C. would achieve from the permanency of adoption by foster parents with whom A.C. shared a much stronger bond. We therefore find no error.

## 2. Denial of Placement with Paternal Aunt

### A. *Father's Standing*

" 'For purposes of appellate standing in dependency cases . . . "[t]he parent's primary interest in dependency is usually reunification." ' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 692.) Where the juvenile court has terminated reunification services, a parent generally lacks standing to raise issues relating to the child's placement, because resolution of those issues will have no effect on reunification. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1035; see *In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1460 ["[o]nce a parent's reunification services have been terminated, the parent has no standing to appeal relative placement preference issues"]; see also *In re K.C.* (2011) 52 Cal.4th 231, 236.)

An exception to this general rule is that a parent has standing to challenge a placement order if it could affect the applicability of an exception to termination of parental rights. (See *In re K.C.*, *supra*, 52 Cal.4th at p. 238; *In re A.S.* (2012) 205 Cal.App.4th 1332, 1339-1340; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053-1054.) Because father's reunification services were bypassed at the jurisdictional hearing, which father elected not to attend, and because father does not challenge the termination of his parental rights on appeal, he has no standing to challenge the Department's refusal to place A.C. with paternal aunt. (See *In re K.C.*, *supra*, at p. 238.)

Courts have recognized that a parent lacking standing to appeal may nonetheless achieve "a status loosely akin to that of amicus curiae" if they extensively litigated the issue to be raised on appeal below. (See *In re K.C.*, *supra*, 52 Cal.4th at p. 239; see also *Cesar V. v. Superior Court*, *supra*, 91 Cal.App.4th at pp. 1030, 1035.) We decline to extend this status to father. He took no interest in the proceedings until the very end, expressly declining to participate in the jurisdictional hearing where these issues could

13

have been timely addressed. Although father joined in mother's eleventh-hour arguments seeking placement with paternal aunt, he did not extensively litigate the placement issue.

To the contrary, father withdrew his section 388 petition and did not raise any issues below that would warrant appellate consideration of his belated arguments concerning A.C.'s placement. (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222 [failing to raise an issue below forfeits it on appeal].)

### B.    *Mother's Section 388 Petitions*

"The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstances or new evidence and that the modification would promote the best interests of the child." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446.) The resolution of a section 388 petition is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.]" (*Id.* at pp. 318-319.)

We find no abuse of discretion here. A.C. had been placed with Mr. and Mrs. P. for more than half of his young life, and was thriving in their care. He was strongly bonded to them and wanted to live with them for "always." Paternal aunt was a stranger to A.C.; she had only visited with him four or five times, and he was unsure whether he wanted to continue seeing her. When mother filed her section 388 petitions, reunification services had been terminated, and therefore the statutory preference for placement shifted to A.C.'s current caretakers rather than his relatives. (§ 366.26, subd. (k).) Moreover, any previous failure to consider relatives for placement was irrelevant to A.C.'s *current* wellbeing. (See § 361.3, subds. (a), (d) [relative placement preference generally only applies *before* disposition; it applies after disposition only "whenever a new placement of the child must be made"; see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 464 [current circumstances are relevant to resolution of a section 388 petition].)

**DISPOSITION**

The orders are affirmed.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.