Filed 10/28/14  In re J.D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.D., et al., Persons Coming Under the Juvenile Court Law. | B253841 (Los Angeles County Super. Ct. No. CK92805) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DARREL D., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert Draper, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Appellant.

_____

Darrel D. (father) appeals the dependency court's summary denial of his petition under Welfare and Institutions Code section 388.[1]  We conclude the court did not abuse its discretion and affirm the order denying father's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

J.D., the nine-year-old girl who is the subject of this appeal, was detained on April 2, 2012, after an incident of domestic violence between Kathleen W. (mother) and mother's boyfriend, Alan T.  Mother is 27 years old and has a tumultuous history.  She came to the United States from Nicaragua when she was five, and was raised by Doreen, her adoptive mother.  Mother reports being physically and sexually abused during her childhood.  Father is Doreen's biological son, and so mother's adoptive brother.  Mother first met father in 2001, when he was released from prison after serving a 14-year-sentence for felony assault and robbery.  Mother was 14 and father was 25.  Mother claims father raped her for two years until she gave birth to J.D. when she was 16.  Father claims he only had sex with mother once, but acknowledges that J.D. is his daughter.  Mother has a son who resides with his biological father, Eric R.  Mother reports that both fathers were verbally and physically abusive towards her.  Mother now has two daughters with Alan T., including one born during the current dependency proceeding.  Although mother denies any abuse, there is ample evidence of domestic violence in this relationship as well.

Father[2] has a lengthy criminal history, including convictions for second degree robbery and assault with a deadly weapon in 1994, driving under the influence of alcohol in 2002, 2006, and 2008, passing a fictitious check in 2008, and obstructing a public officer in 2009.  When the Department of Children and Family Services (Department)

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] The court declared father a presumed father on May 8, 2012.

2

interviewed him in April 2012, father reported he had been unemployed since December 2010 and has seven children with three different women. The children ranged in age from ten months old to eighteen years old. He was living with Doreen from 2009 until February 2012, when he discovered that his uncle, who also lived in the home, was having an affair with his wife and was possibly the father of his two youngest children. He stated he no longer trusted his mother because she was aware of the affair and did not disclose it to him.

Doreen has cared for J.D. for most of her life. Mother would visit J.D. and sometimes stay when she did not have a place to live. Mother reportedly asked to keep J.D. for a week in February 2012, and then did not return J.D. to Doreen. After J.D. was detained, the Department considered placing her with Doreen, but decided against the placement because of the lack of a criminal clearance for Doreen's brother, clutter and safety hazards in the home, and her inability to care for J.D. without financial assistance. Later investigation revealed that in 2002, mother's allegations of physical and emotional abuse by Doreen were substantiated, and the family received voluntary family maintenance services from February through October of 2002. This information results in a "hit" on the Child Abuse Central Index (CACI) that precludes J.D.'s placement with Doreen under the Adoption and Safe Families Act of 1997 (ASFA).

The Department filed a Jurisdiction and Disposition Report on May 4, 2012, recommending the court give the Department discretion to suitably place J.D., noting that father was unemployed, did not have stable or permanent housing, and was facing possible criminal charges for allegedly assaulting mother on March 2, 2012. The report pointed out that if father was arrested in connection with those charges, he would be unable to provide basic necessities for J.D. The Department was considering placing J.D. with Eric R., the father of J.D.'s half-brother. Eric R. and his wife expressed a willingness to care for J.D, and J.D. was excited about the prospect of living with her "Daddy Eric" as demonstrated in the following summary of an interview conducted by the Department investigator (DI): "On 4/25/12, DI met with [J.D] and asked her with whom she wanted to live. [J.D.] stated 'I would love, love, love to live with my Daddy

3

Eric. He is so nice and helpful. He doesn't do anything to me. If feel really safe with Eric and his girlfriend. I really want to live with him until everything clears up.' DI asked [J.D.] how she felt about living with father Darrell [D.] [J.D.] stated 'I do not want to live alone with him.' When DI asked [J.D.] why she did not want to live with father Darrell [D.] she became quiet and changed the subject."

The Department ultimately placed J.D. with Eric R. and his wife in December 2012, but in the interim, father made two requests to have J.D. placed with him. On June 12, 2012, father's counsel walked-on a request to have J.D. released to father, contending that pending criminal charges against him had been dropped.[3] The court denied the request on June 22, 2012, but granted the Department discretion to change J.D.'s placement. On August 24, 2012, father filed a 388 petition seeking an order placing J.D. with him, but the court denied the petition as untimely because the case had not yet been adjudicated and because it would not be in J.D.'s best interests. On October 25, 2012, the court ordered unmonitored five-hour weekly visits for father and directed the Department to prepare a supplemental report addressing J.D.'s visits with father, any risk if J.D. was released to father, and any change to its initial recommendation against J.D.'s release to father.

The Department's December 27, 2012 report concluded it would be detrimental to J.D.'s well-being to force her to have continued unmonitored visits with father, and instead recommended individual and joint therapy for both J.D. and father. J.D. had complained that she did not want to see father because "every time we have a visit he smells me. He sniffs my hair, my arms and my legs. I don't like it. I don't like when he sniffs me. I don't want to be alone with him." J.D.'s caregivers also expressed concern that father was coaching J.D. to say she wanted to live with him. Father remained

_____

[3] On March 2, 2012, mother accused father of following her off a bus and hitting her on the head with a hard object. Father was not on the scene, but mother was bleeding and required medical treatment. Father was charged with exhibiting a deadly weapon, assault with a deadly weapon, and inflicting corporal punishment on a former cohabitant, but the charges were ultimately dismissed on the eve of trial.

4

unemployed and J.D.'s therapist observed J.D. showed no significant attachment to her father.

By March 2013, J.D.'s teachers were expressing concerns about a drastic deterioration in J.D.'s behavior, describing her as going from a star student to one with the most disciplinary issues in a matter of months. The Department definitively ruled out Doreen as a placement option, based on a substantiated allegation of child abuse from 2002. Even though J.D. reported that unmonitored overnight weekend visits at Doreen's home were going well, the Department reported that during the duration of the case "there has been documented coaching, allegations of inappropriate behavior by father . . . and inappropriate behavior by grandmother, Doreen." Even though father was permitted unmonitored visits while J.D. was staying with Doreen, he had called J.D., but had not visited.

On April 3, 2013, the court found J.D. to be a child described by subdivisions (a) and (b) of section 300. After a disposition hearing on April 24, 2013, the court found J.D.'s continued removal from both mother and father was necessary. The court's ordered father to attend parenting classes and participate in both individual counseling (to address anger management and domestic violence) and conjoint counseling with J.D. The court granted father five to eight hours of monitored visitation, but on October 25, 2013, the order was corrected nunc pro tunc to permit the visits to be unmonitored.

Father, who was present at the April 24, 2013 disposition hearing, claimed to be unaware until October that the court had ordered him to enroll in any classes or counseling. He had an initial individual counseling session in November, with the next session scheduled for January. He claimed to have taken 13 parenting classes, but did not provide the social worker with any proof of attendance. Father did not consistently visit J.D. between April and September, in part because he believed his visits should be unmonitored, and in part because he was not providing the Department with receipts showing the use of Department-provided transportation funds. Because caregivers expressed a reluctance to transport J.D. to visits with her father and Doreen, the Department attempted to assist, but was met with resistance. First, Doreen refused to

allow a social worker into her home to do a brief assessment. Second, father indicated he was busy and not willing to schedule his visits on weekdays when a social worker was available. When the Department asked what he was busy doing, he said he was busy trying to locate court-ordered programs to enroll in. J.D. reported that when she visits father, he talks to her about the case. Around the Thanksgiving holiday, father raised concerns that J.D.'s caregivers had changed her placement without notifying him or the Department, but those concerns were deemed unfounded. J.D.'s caregivers once expressed frustration at changing court orders and visitation plans and expressed a desire for J.D. to live elsewhere, but they did not raise the point again, and J.D. remains placed with them.

On December 20, 2013, the court ordered that J.D.'s weekend overnight visits with Doreen could be suspended if she refused access to inspect her home. The court further ordered unmonitored day visits for father "when minor is on weekend visits with paternal grandmother" and father was not to discuss the case with J.D. The same day, father filed a petition to change its placement order and place J.D. with father, so that he could care for her with Doreen's assistance. The court denied the petition without a hearing on January 2, 2014, because the request did not state new evidence or a change of circumstances, and the proposed change did not promote the best interest of the child. Father appealed.

## DISCUSSION

Father contends the dependency court erroneously denied his December 20, 2013 section 388 petition without a hearing. We disagree.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition

6

should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.] [¶] However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances *and* that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

The juvenile court may consider the entire factual and procedural history of the case in deciding whether to grant a hearing on a petition under section 388. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.) The asserted change of circumstances "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) In determining whether a change in placement is warranted, the court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446-447.) In assessing the best interests of the child, "a primary consideration . . . is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th at 295, 317.)

"We review the juvenile court's denial of a section 388 petition for an abuse of discretion. [Citation.] The court 'exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.' [Citation.] The test for abuse of discretion is whether the court exceeded the bounds of reason. '"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]' [Citation.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.)

Even liberally construing the petition, when the court considered father's assertions in the context of the entire court file, it properly concluded that father had not made a prima facie case warranting a hearing. The only "change" identified in father's petition was the fact that he had recently begun to engage in some of the reunification services the court had ordered in April. The only reason father proffered for why such a change would be in J.D.'s best interests was that J.D. "is traumatized by the current placement and wants a stable home." Neither allegation meets the prima facie requirements for the two showings required under section 388.

First, in April 2013, the court ordered father to attend parenting classes and to participate in individual counseling to address anger management and domestic violence issues as well as conjoint counseling with J.D. Rather than showing completion of court-ordered services or even substantial progress, father's section 388 petition alleged only that he had one session of individual therapy, and offered no evidence to support his allegation he had completed 13 sessions of parenting classes. Simply beginning services ordered by the court eight months earlier is not a change in circumstances warranting a change in a prior court order. (*In re Mickel O., supra,* 197 Cal.App.4th at p. 615 ["[t]he petitioner must show *changed*, not changing, circumstances"].)

Second, other than the bald assertion in the petition that "my child is traumatized by current placement and wants a stable home," father offers no evidence that changing J.D.'s placement from her current caretakers to father would be in her best interests. The court was already aware that ASFA prevented the Department from placing J.D. with Doreen because of a CACI "hit" of prior substantiated child abuse allegations against her. Nothing in the court record demonstrates that father had obtained stable housing or the means to provide for J.D. without his mother's assistance. In fact, by requesting that J.D. be released to him "and with the assistance of my mother (paternal grandmother) I will care for my child," father concedes that he cannot care for J.D. without his mother's assistance. Doreen was also combative, refusing to give the Department permission to inspect her home before an unmonitored visit. The same day father filed his section 388 petition, the court ordered that visits with Doreen could be discontinued if she refused to

permit inspection by the Department. J.D.'s attitude and behavior deteriorated dramatically when father resumed unmonitored visitation. Her teachers described the decline as her spirit being broken. These ongoing issues with J.D.'s visits with father and Doreen support the court's conclusion that father failed to make a prima facie case that it would be in J.D.'s best interests to be placed with father, rather than her current caretakers. On the record before us, there was no abuse of discretion to deny father's section 388 petition without a hearing.

## DISPOSITION

The dependency court's order denying father's section 388 petition is affirmed.


KRIEGLER, J.

I concur:


TURNER, P. J.

9

MOSK, J., Concurring

I concur.

Many courts have said that the standard of review for a summary denial of a Welfare and Institutions Code section 388 petition is abuse of discretion. (See, e.g., *In re Angel B.* (2002) 97 Cal.App.4th 454, 462.) Sometimes cited for this proposition is *In re Stephanie M.* (1994) 7 Cal.4th 295, 316-319, even though that case denied a petition after a contested hearing and did not involve a prima facie evaluation. (See *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) The trial court in denying a hearing has applied the law to undisputed facts to conclude that there was no prima facie case. Thus, a strong argument can, and has been made, that the decision is a legal one subject to de novo review. Nevertheless, as noted, somehow courts have persisted in applying an abuse of discretion standard. I would affirm under either standard of review.


MOSK, J.