Filed 2/23/23  In re Z.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.S., a Person Coming Under the Juvenile Court Law. | |
| | D081196 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J518208C) |
| Plaintiff and Respondent, | |
| v. | |
| M.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

In this dependency action, M.S. (Mother) filed a Welfare and Institutions Code section 388[1] petition seeking to change the juvenile court's prior order, which sustained the section 387 petition filed by the San Diego County Health and Human Services Agency (Agency) and authorized the continued removal of her son, Z.S., from her care. Mother argued that, because she had completed drug treatment and remained clean for nearly a year while maintaining her close bond with Z.S., the court should place Z.S. with her. The juvenile court denied the petition. Mother appealed, contending that she met her burden under section 388 to show that a change in circumstances and Z.S.'s best interests warranted the requested change in Z.S.'s placement. We conclude the court did not abuse its discretion and affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Mother used methamphetamine on and off for 25 years, starting when she was about 15 years old. The Agency has removed all four of her children, and she had 30 prior referrals involving her older children.

A.    *Voluntary services*

When Z.S. was born in April 2019, both Mother and Z.S. tested positive for methamphetamine. Mother agreed to engage in voluntary services and the Agency allowed Z.S. to remain in her care. In May, Mother enrolled in

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise designated.

[2]    "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

drug treatment services at Episcopal Community Services (ECS). In June, Mother was arrested for being intoxicated in public.

Mother completed her treatment at ECS in September 2019. However, in October, a casino security guard discovered a lost purse containing methamphetamine and Mother's casino membership card. Mother identified the purse as hers and showed her driver's license to claim it. Upon realizing what was inside, she fled. Casino security staff discovered a couple who both appeared to be under the influence caring for Z.S. in Mother's room and evicted them from the hotel. In a subsequent drug screen, Mother tested positive for methamphetamine.

B. *The first removal*

In January 2020, police pulled Mother over for a traffic violation and found her in possession of methamphetamine and drug paraphernalia. Nine-month-old Z.S. was asleep in the car in an unrestrained car seat. The police arrested Mother and Z.S. was transported to Polinsky Children's Center (Polinsky).

Following Z.S.'s removal, the Agency petitioned the juvenile court under section 300, subdivision (b), on behalf of Z.S. The Agency alleged that Mother's use of methamphetamine from April 2019 to the date of the petition, and the fact that she had been arrested twice, rendered her unable to provide regular care for Z.S. As a result, there was a substantial risk that Z.S. would suffer serious physical harm or illness.

At the detention hearing, the juvenile court ordered Z.S. to remain detained at Polinsky and ordered the Agency to provide voluntary services to

3

Mother.[3]  The Agency subsequently placed Z.S. with his godmother, L.S., a nonrelative extended family member.

During an interview with the Agency, Mother explained that she believed her depression triggered her to start using, but that she stopped taking medication for her depression because it made her "feel weird."  She expressed eagerness to address her "mental health and trauma" in counseling and enrolled in an inpatient treatment program at North County Serenity House (Serenity).  At the June 2020 contested adjudication and disposition hearing, the juvenile court sustained the petition.

Mother followed her case plan (including taking medication for depression), advanced in her visitation with Z.S., completed therapy at Serenity, and resided in sober living housing until August.  She completed her substance abuse program in September.  She also began participating in a 12-step recovery program and reported being on step five with her sponsor, Gene.  In light of her progress, the court ordered the Agency to return Z.S. to Mother's care during a six-month review hearing in December.

C.    *The second removal*

In its June 2021 status review report, the Agency indicated that, although Mother was doing well, it had concerns about her organization because she was not consistently making it to her medical appointments or Z.S.'s services appointments.  She had not seen a mental health provider in over five months and appeared to be overwhelmed.  The Agency also had concerns about Z.S.'s behaviors and had obtained referrals for more services

---

3    Although Mother identified the alleged father during the investigation following Z.S.'s birth and the Agency and the court repeatedly reached out to him, Z.S.'s alleged father never formally participated in the proceedings.  Accordingly, we limit our discussion to Mother's involvement in the case.

for him.  However, the Agency recognized that Z.S. would only benefit if Mother became more consistent in taking him to appointments.

Mother tested positive for methamphetamine twice in August 2021. The Agency reported to the court that it did not remove Z.S. because Mother admitted the relapse and was willing to be assessed by a substance abuse specialist and engage in outpatient services.  She planned to participate in a new treatment program but did not do so.  She also stopped following up with her mental health providers around this time because she did not agree with their recommendation that she take medication.  Mother did, however, test negative in September.

Later in September and again in October, Mother tested positive for methamphetamine.  Throughout October and November, social workers were unable to contact mother or check on Z.S.  In late November, the Agency learned Mother had been discharged from a treatment program, missed several drug tests, and then tested positive for methamphetamine.  Once the Agency regained contact with Mother and Z.S., it also expressed concern about Z.S.'s aggressive behavior towards a social worker.

In November 2021, the Agency filed a petition under section 387 seeking to modify the court's December 2020 order placing Z.S. with Mother on the grounds that her excessive use of methamphetamine rendered her unable to adequately care for and supervise Z.S.  At the subsequent detention hearing, the court made a prima facie finding on the section 387 petition and issued a pickup and detain order as to Z.S.

The Agency again placed Z.S. with his godmother, who reported behavioral concerns such as hitting, throwing objects, having tantrums, and only eating a limited variety of foods.  In order to stabilize the placement, the Agency referred Z.S. to additional services, where he was diagnosed with

adjustment disorder with anxiety. The Agency learned that Mother had not taken Z.S. to occupational therapy since 2020, and that they had not visited the infant education provider since October 2021.

D. *Subsequent treatment and permanency planning*

Mother enrolled in an ECS recovery program on November 23, 2021, and actively engaged in treatment. She also visited Z.S. twice a week.

At the February 2022 contested adjudication and disposition hearing, the court sustained the section 387 petition, continued Z.S. as a dependent child, and terminated Mother's reunification services.

Z.S. actively participated in services and completed his case goals in May 2022. The godmother noted a big improvement in his behaviors but requested and received additional services to address tantrums and communication.

Mother had two supervised visits per week with Z.S., during which he often ran to her or yelled "Mama!" upon her arrival. Mother would bring snacks and toys, play with him, and change his diaper or redirect his behavior when necessary. Although Z.S. asked for his mother daily, he generally did not have trouble separating from her when visits ended. On one occasion in April, he ran and stood in front of the door when Mother tried to leave but was easily redirected. He did the same on another occasion when a social worker tried to leave. He cried twice when Mother was leaving, but both times it was because he could not keep a toy she brought.

Mother completed the ECS program in June, having consistently tested negative. She submitted a letter from an ECS therapist indicating that she engaged in individual therapy while enrolled in the program. It does not

6

appear Mother has obtained mental health or psychiatric care since July 2022, at the latest.[4]

In July, the godmother reported that Mother was an hour late for a visit, did not seem as involved as usual in the visit, and had not been consistent with video visits. She also noted that Z.S. no longer asked for his mother on a daily basis. When asked whether Z.S. had displayed any signs of distress after the visit, the godmother reported that Z.S. had become more aggressive, punched her and other children in the home, and struggled more with simple directions.

Thereafter, Mother continued to reliably visit and play with Z.S. twice a week—often at parks, the library, or restaurants. He kissed and hugged her and called her "Mama." But social workers expressed concern about instances when Mother did not sufficiently supervise Z.S. In September, Z.S. ran away from Mother outside a store. She walked after him, but he ran around a corner where he was stopped by citizens concerned about him getting hurt by the cars " 'flying in and out of the parking lot.' " In October, Z.S. ran away from the library towards the street and ignored Mother's calls to stop. She walked after him, but the social worker ran after him, took his hand, and walked him back to Mother.

E. *Mother's section 388 petition*

In October, Mother filed a section 388 petition asking the court to change its February order and return Z.S. to her care. In support of her petition, Mother provided evidence that she had completed an outpatient

---

[4] The August 5, 2022 letter from the ECS therapist indicates that Mother "***was*** meeting with [her] for individual therapy," (boldface and italics added) and Mother stated in her section 388 petition that she "was provided both group and individual sessions" in her ECS treatment program and has since completed her treatment through ECS.

drug treatment program at ECS, consistently tested negative, engaged in individual therapy, attended weekly Alcoholics Anonymous (A.A.) meetings, worked with a sponsor, developed a relapse prevention plan, and consistently visited Z.S. for four hours a week. The court made a prima facie finding on the section 388 petition and set a hearing.

The Agency submitted an addendum report in response to the petition. Therein it noted that Mother's sponsor, Nicole, said Mother was " 'pretty consistent' " about her weekly check-ins and texted Nicole daily gratitude lists two to five times per week. The sponsor explained her understanding that the difference between Narcotics Anonymous (N.A.) meetings and A.A. meetings is that A.A. attendees work through the 12 steps and achieve a stronger recovery than those attending N.A. meetings. The Agency indicated that Mother had reported during an interview that her longest period of sobriety in the past had been two or two and a half years.

The Agency also provided updates on Mother's treatment status, confirming that while Mother had completed the outpatient treatment program at ECS in June, she declined to participate in the "strongly recommended" voluntary program afterwards because she felt she had enough support from her sponsor. The Agency was unable to verify Mother's individual therapy reports as her therapist had left ECS. It acknowledged Mother's progress and positive relationship with Z.S., but in light of the fact that Mother had entered drug treatment programs and relapsed on three occasions just within the three-year period of the case, the Agency recommended that the court deny the section 388 petition. Because the godmother was committed to adopting Z.S., the Agency recommended terminating parental rights and ordering a permanent plan of adoption.

The court heard evidence on the 388 petition on November 1, 2022. Mother's sponsor testified that Mother was currently finishing up step two of the twelve steps, and that Mother had stayed sober through very difficult experiences like dealing with this court process, going to work part-time and then full-time, and leaving outpatient therapy. She noted that Mother would reach one year of sobriety on November 22nd, which she explained was "a huge deal in A.A." because getting to one year "is a really difficult task."

Although the court acknowledged Mother's "significant and admirable period of sobriety," it concluded the evidence supporting the petition was "strong, but . . . not strong enough." The court conceded that it did not have enough facts regarding whether Z.S.'s behaviors and the extra care he required were caused by being born with methamphetamine in his system or something that Mother triggers. Nonetheless, the court denied the section 388 petition, concluding that Mother had not rebutted the presumption that continued out-of-home placement, where his care is consistent and certain, was in Z.S.'s best interest.

Mother timely appealed the juvenile court's order denying her section 388 petition.

## II.

## DISCUSSION

On appeal, Mother asserts that the juvenile court abused its discretion by denying her section 388 petition. She contends her circumstances clearly changed and it was in Z.S.'s best interest to return him to her care. The Agency disagrees, arguing that Mother failed to meet her burden of establishing either element required to succeed on a section 388 petition.

9

A.    *Applicable law*

Under California's dependency scheme, the parent is given a reasonable amount of time to reunify with the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Once reunification services are terminated, the focus shifts to prioritizing the child's interest in permanency and stability. (*Ibid.*) However, section 388 provides an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).)

Section 388 allows a parent to petition the juvenile court to modify a placement order due to changed circumstances or new evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) To prevail on a section 388 petition, the petitioning parent must show by a preponderance of the evidence that (1) new evidence or a changed circumstance warrants alteration of the juvenile court's prior placement order, and (2) the proposed change is in the best interest of the child. (*Ibid.*) " 'Not every change in circumstance can justify modification of a prior order.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).) To be sufficient, the change must be material, relevant, and substantial. (*Id.* at pp. 120, 121, fn. 3.)

We review the juvenile court's denial of a section 388 petition for abuse of discretion. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 447.) A dependency court abuses its discretion when its decision exceeds the bounds of reason. (*Stephanie M., supra*, 7 Cal.4th at pp. 318–319.) Thus, unless it is clearly established that the court made an " ' "arbitrary, capricious, or patently absurd determination," ' " the trial court's ruling should not be disturbed on appeal. (*Id.* at p. 318.)

B.    *Analysis*

Mother contends the juvenile court abused its discretion in denying her section 388 petition.  She argues that her nearly one year of sobriety is a changed circumstance, and that it is in Z.S.'s best interest to reunify with her because they have a significant bond.  We disagree.

With regard to the first requirement for relief under section 388, Mother submits that her circumstances have changed in several ways.  She completed the extensive outpatient substance abuse treatment program offered by ECS, attended individual therapy, submitted to random drug tests, and started working with an A.A. sponsor.  According to Mother, her actions have resulted in significant and substantial life changes because she now has a support network, a relapse prevention plan, and a sponsor who is helping her work actively and methodically through the twelve steps.  Further, she contends that it is all the more impressive that she has remained drug-free for almost a year because she has done so despite the stress of this case.

The Agency submits that because Mother has previously done most, if not all, of these things, her circumstances might be described as "changing," at best.  Although the distinction between "changed" and "changing" circumstances is frequently drawn in cases concerning section 388, it is merely "another way of describing the distinction . . . between changes that are material and those that are not." (*N.F., supra*, 68 Cal.App.5th at p. 121, fn. 3.)  "However expressed, the point is that section 388 requires a change that is relevant and substantial (rather than irrelevant or de minimis) when considered in light of all of the circumstances of the case." (*Ibid.*)  We agree that although Mother's most recent progress is admirable, given her long history of relapsing after periods of sobriety, the changes are not material.

11

According to her own admissions, Mother has undergone inpatient and outpatient therapy previously and stayed clean for long periods of time in the past. Prior to Z.S.'s birth, she completed two stints of inpatient treatment and one outpatient program. During Z.S.'s short three years of life, Mother has completed two programs at ECS and one at Serenity. She testified during a contested adjudication and disposition hearing that her longest past period of sobriety was 14 months. On another occasion, she told a social worker it was two to two and a half years. Unfortunately, in between all of these treatment programs and drug and alcohol-free periods, Mother has relapsed.

We see no reason why the circumstances are appreciably different this time. Mother stresses that she has a sponsor and is working through the A.A. twelve steps. But she worked through step five with her prior sponsor, Gene, and is only on step two this time with Nicole. Likewise, her contention that she continues to attend individual therapy is unpersuasive because she testified that she participated in individual and group therapy before a prior relapse. The record also does not confirm that she continued individual therapy after she completed the ECS program in the summer of 2022. Thus, it was reasonable for the juvenile court to conclude that Mother's current recovery period, while highly commendable, did not constitute a changed circumstance. (*See N.F., supra*, 68 Cal.App.5th at p. 121 [confirming that no changed circumstances existed where the mother "had a history of completing programs and then relapsing"].)

We also are not persuaded that the juvenile court erred in finding that it was not in Z.S.'s best interest to be placed with Mother. As even Agency counsel acknowledged, it appears Mother and Z.S. "very much love each other." But this is not enough. The focus at this stage is on permanency and

12

stability and "there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M., supra*, 7 Cal.4th at p. 317.) Z.S. has been removed from Mother's care twice in the three years he has been alive, and she did not keep up with his occupational therapy and infant education sessions during his most recent placement with her. There is some evidence that this lack of stability has negatively impacted Z.S., as he started acting out (hitting, throwing things, having tantrums, etc.) after his most recent removal. Social workers also expressed concern on more than one occasion during the two months prior to the court's ruling on the 388 petition that Mother did not adequately supervise Z.S. near streets and parking lots. Given Mother's past inability to provide Z.S. with a permanent home and consistent attention to his developmental and safety needs, it was reasonable for the court to infer that it was not in Z.S.'s best interest to return him to Mother yet again.

Furthermore, the record does not demonstrate that Mother and Z.S. are so bonded that this factor should override other concerns. In *Kimberly F., supra*, 56 Cal.App.4th at pages 523, 532, the reviewing court found return to the parent to be in the children's best interests, in part, because the ten-year-old and seven-year-old were so strongly bonded to their mother that they expressed little interest in being adopted by their caretakers. Here, Z.S. was first removed as an infant and has lived more than half of his three years of life with the godmother. Although Mother and Z.S. appear to enjoy pleasant weekly visits, Z.S. has never had any difficulty separating from her (except when he was not allowed to keep a toy she brought to the visit) and has asked for her less frequently in recent months. Under these circumstances, there was nothing arbitrary or capricious about the juvenile court's conclusion that

13

Mother did not present sufficient evidence to rebut the presumption that it was in Z.S.'s best interest to remain with the godmother.

Accordingly, we conclude that the juvenile court did not abuse its discretion in denying Mother's section 388 petition.

III.

DISPOSITION

The order is affirmed.


IRION, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.